728 A.2d 798

**ASHCRAFT & GEREL**

v.

**Larry SHAW, a Minor etc.**

**No. 585, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

May 3, 1999.

**326**

Barry E. Cohen (Crowell & Moring LLP, on the brief), Washington, DC, for appellant.

Mitchell Y. Mirviss (Kathleen G. Cox, Venable, Baetjer and Howard, LLP, Andrew D. Freeman and Brown, Goldstein & Levy, LLP, on the brief), Baltimore, for appellees.

Argued before EYLER, SONNER, and ADKINS, JJ.

ADKINS, Judge.

This case is an appeal from an order (Order) issued by the Circuit Court for Prince George's County requiring the production of certain documents in the possession of appellant, Ashcraft & Gerel (A & G), a law firm which represented appellee, Larry Shaw (Larry), and his mother, Elouise Witherspoon (Witherspoon), in medical malpractice litigation. The appeal involves three consolidated cases. The first case was a claim for medical malpractice against emergency room personnel at Prince George's County Hospital Center in which Witherspoon sued on her own behalf and on behalf of Larry (Maryland Malpractice Case).[1] Both Witherspoon and Larry were represented by A & G. In the second case, the Prince

---

1. Witherspoon, on behalf of Larry and herself also sued a physician in New York for malpractice in diagnosing Larry's illness. This case shall be referred to as the "New York Malpractice Case." The Maryland

George's County Department of Social Services (DSS) petitioned to have Larry, a severely disabled minor child, declared a Child in Need of Assistance (CINA), pursuant to Md.Code (1974, 1998 Repl.Vol.), § 3–812 of the Courts & Judicial Proceedings Article (hereinafter, CJ) because his mother was unable to care for him (CINA Case). After the court found Larry to be a CINA, Larry's court-appointed attorney, Kathaleen Brault, Esq. (Brault), petitioned for appointment of a guardian of Larry's property, alleging that Witherspoon failed to act in his best interests in: 1) negotiating the settlement of the Maryland Malpractice Case and a related case; 2) allocating the settlement between the separate claims of Larry and his mother; and 3) handling the settlement funds. Brault also alleged that A & G had a conflict of interest relating to these matters and acted without attempting to resolve the conflict. The third case was an action brought by Witherspoon in the circuit court seeking the appointment of her mother, Ms. Padmore, and a bank as guardians of Larry's property (Guardianship Case).[2] Although A & G was not originally a party to any of the three suits, it moved to intervene in the CINA Case "for the limited purpose of explaining to the Court how the settlement in the [Maryland Malpractice Case] was achieved and how the proceeds of the settlement were disbursed."

## ISSUES

The issues raised in this appeal are whether: 1) the Order requiring that A & G disclose documents in its possession was a final order subject to immediate appeal; 2) the circuit court had sufficient jurisdiction over A & G to order disclosure by A & G of documents in its possession, including written communications between A & G and Witherspoon pertaining to the Maryland Malpractice Case and the CINA Case; and 3) A &

---

Malpractice Case and the New York Malpractice Case shall together be referred to as the "Malpractice Cases."

**2.** For purposes of discussing the issues in this case, we shall use the term "Guardianship Case" to refer to both petitions to name a guardian even though Brault's petition was actually filed in the CINA Case.

G can rightfully claim an attorney-client privilege or work product privilege to keep communications between A & G and Witherspoon confidential from Larry.

## FACTS AND PROCEDURAL BACKGROUND

Larry was born in Liberia, Africa, in 1987 and lived there for the first four years of his life. Witherspoon, a Liberian citizen and permanent resident of the United States, resided in Maryland. During a 1991 airplane flight to New York with his mother, Larry became ill. Upon landing in New York, he was diagnosed by a JFK Airport physician with bronchitis. Two days later, when Witherspoon took Larry to the Prince George's County Hospital Center, a physician offered the same diagnosis. The next day, when Larry fell into a coma and suffered seizures, physicians at the Children's Hospital Medical Center in Washington, D.C. diagnosed him with cerebral malaria. By that time, Larry suffered cerebral damage causing severe retardation, seizure disorder, and other injuries, all of which required special care and medication.

After his release from the hospital, Witherspoon had much difficulty managing Larry's care even when provided with supportive services. She failed to dispense medication and comply with other therapeutic recommendations. On one occasion, she left Larry unattended for over an hour, which resulted in a protective services referral to DSS. In October 1992, DSS petitioned the circuit court to declare Larry a CINA, alleging, *inter alia*, that Witherspoon was unable or unwilling to provide proper care to Larry because she had an uncontrolled seizure disorder and exhibited signs of an emotional disturbance. The petition also alleged that she would not feed or medicate herself or Larry without prompting and assistance from others. After the CINA petition was filed, Witherspoon was hospitalized, and in October 1992, Larry was temporarily placed in the Holly Center, a Department of Health and Mental Hygiene (DHMH) residential facility in Salisbury, Maryland. On March 22, 1993, a Juvenile Court Master found Larry to be a CINA and committed him to the custody of DHMH under the protective supervision of DSS. A & G represented Witherspoon in the CINA Case.

In May 1992, Witherspoon retained A & G to represent Larry and her with respect to their potential claims against the medical providers in New York and Maryland. She agreed to pay A & G a forty percent contingency fee. Late in 1993, A & G, through New York counsel, brought the New York Malpractice Case. Witherspoon asserted claims on behalf of herself and as Larry's "natural guardian." Apparently, the complaint did not state that Larry had been adjudicated a CINA or placed in temporary State custody. In July 1994, A & G filed the Maryland Malpractice Case in the Maryland Health Claims Arbitration Office and named Witherspoon as Larry's next friend. There was no disclosure in these proceedings that Larry was committed to State custody or institutionalized at a DHMH facility. At the time of filing of the Medical Malpractice Cases, no guardian of Larry's property had been appointed.

By the fall of 1995, new issues arose in the CINA Case. Brault, as Larry's CINA counsel, filed a motion alleging that Witherspoon seldom visited Larry at the Holly Center and failed to correctly medicate and feed Larry during his first home visit. Counsel requested in the motion that Witherspoon be stripped of guardianship rights to consent to medical and education decisions. The juvenile court, after a hearing, ordered the requested limitation on Witherspoon's guardianship rights.[3]

At the time of Brault's motion, Witherspoon was still represented by A & G lawyers, David M. LaCivita (LaCivita) and Martin Trpis (Trpis). Shortly thereafter, when Brault complained that A & G had a conflict of interest in representing Witherspoon in the CINA Case and Larry and Witherspoon jointly in the Malpractice Cases, A & G withdrew from the CINA Case. Jon W. Sargent, Esq. (Sargent) entered his appearance for Witherspoon in the CINA Case.

---

**3.** On November 7, 1995, the court awarded the DHMH and DSS joint limited guardianship of Larry for educational, medical, surgical, dental, and eye-care purposes.

In May 1996, A & G, on behalf of Larry and Witherspoon, entered a settlement agreement in the Maryland Malpractice Case and filed suit in the circuit court to obtain court approval of the settlement. Neither the complaint nor the attached affidavit by LaCivita disclosed Larry's status as a CINA, his commitment to DHMH custody, or the limited guardianship. Witherspoon was described only as Larry's "mother and next friend." The settlement agreement provided that Witherspoon would be the trustee of Larry's funds. At the request of counsel, Judge Ahalt of the circuit court held an informal chambers conference attended by LaCivita, Trpis, Witherspoon, and counsel for defendants. Judge Ahalt approved the settlement and A & G's proposed allocations of: 1) a $190,000 lump sum to Larry; 2) an annuity to Larry consisting of monthly payments in the amount of $2,221; 3) $50,000 to Witherspoon; 4) $300,000 to the State of Maryland to satisfy a Medical Assistance lien; and 5) $860,000 to A & G for attorneys' fees according to its forty percent contingency agreement. Defense counsel questioned whether a "special needs trust" should be established to receive some of Larry's portion of the settlement, but Trpis opined that Larry did not need such protection and Judge Ahalt approved the allocation as proposed by Trpis.

A settlement in the New York Malpractice Case was presented to the New York court on the same day. The court tentatively approved the settlement after reducing the contingency fee pursuant to New York law. It, however, refused to give final approval without first discussing a "special needs trust" [4] with the Maryland court and counsel.

After the settlement, Witherspoon requested through the CINA Case that she be reunified with Larry (i.e., that Larry

---

4. A special needs trust is designed to protect the assets of the trust by limiting use of the assets to payment for needs of the trust beneficiary (in this case, Larry) that would *not* be provided by a government aid program such as medical assistance. By rendering trust assets unavailable for use for certain items of expense, the trust assets are preserved for special needs of the beneficiary that will not be covered by government subsidized programs. At the death of the beneficiary, the State

be returned to her custody). In July 1996, the juvenile court affirmed a permanency plan of reunification, but granted Brault's request for a psychological assessment of Witherspoon before effectuating reunification and removing Larry from DSS custody. The assessment was completed in mid-October by a psychologist retained by Sargent. When Brault wrote in November requesting a copy of the assessment, Sargent did not respond to the request.

Meanwhile, Brault learned that the Maryland Malpractice Case settled and she wrote to A & G and Sargent requesting details of the settlement terms and safeguards for Larry. Sargent deferred to A & G, but A & G attorney, LaCivita, declined to answer as a result of the confidentiality provision of the settlement agreement. After several months and an additional request, LaCivita provided Brault with a copy of a release which set forth the aggregate settlement sums, but omitted the details of the allocation of proceeds between Larry and Witherspoon and the status of Larry's share.

Brault learned additional information about A & G's representation that she found disquieting when she spoke with Larry's foster mother and former teacher at the Holly Center, Eileen Siple (Siple). Based on this information, Brault filed a motion in the CINA Case, supported by an affidavit from Siple, alleging that A & G lawyer Trpis attempted to induce Siple to distrust Brault and work against her in the CINA Case. According to the motion and affidavit, Siple told Brault that Trpis characterized Brault's father as a "high-powered" attorney from whom Brault learned " 'underhanded' tricks." The motion and affidavit also stated that Trpis advised Siple that Larry would soon "be a very wealthy little boy" and that Siple would "have access to 'a lot of money.' "

---

that provided these benefits holds a lien on the remaining assets of the trust to reimburse it for amounts expended. If a special needs trust is established, there are restrictions on the use of the monies in the trust, including a prohibition against direct payment to the beneficiary from the estate for food, clothing, and shelter. Witherspoon objected to

On December 6, 1996, Brault moved in the CINA Case to have a guardian of Larry's property appointed pursuant to CJ § 3–820(e), and that the court order Witherspoon and her counsel to disclose to Brault all documents pertaining to settlement of the Malpractice Cases. Brault alleged that when A & G presented settlement of the Maryland Malpractice Case to Judge Ahalt for approval, Judge Ahalt was not advised that Larry had been adjudicated a CINA, that he was committed to the custody of DHMH and placed in foster care, or that the court had awarded DHMH and DSS limited guardianship rights regarding Larry's health and education. Based on these allegations and others, Brault expressed concern that Witherspoon and A & G were not administering settlement funds from the Maryland Malpractice Case in a manner consistent with Larry's best interests. Sargent, on behalf of Witherspoon, opposed the motion asserting a lack of jurisdiction over guardianship matters in the juvenile court and alleging that A & G had advised Judge Ahalt of the CINA Case, the foster care, and the limited guardianship of Larry in DHMH and DSS. Apparently, for the first time, Sargent revealed the psychological assessment of Witherspoon which reported that she had substantial cognitive and emotional impairments rendering her unfit to serve as guardian of Larry's property. It also stated that substantial support services would be needed were mother and son to be reunited. Sargent also advised that he intended to file in the Orphans' Court a Petition for Appointment of Guardian seeking appointment of Witherspoon's mother, Ms. Padmore, and the Trust Company of America as co-guardians of Larry's property. This petition, a copy of which was attached to Witherspoon's Answer, provided the specifics of the Medical Malpractice settlement, including the allocation of funds between Witherspoon and Larry, and disclosed that the $2,221 monthly annuity for Larry constituting a portion of the proceeds of settlement "have been accruing since the settlement of the medical malpractice case in June 1996 and are currently being held by the annuity company pending the appointment of a guardian of the property." It also disclosed that an additional lump

setting aside any of the settlement monies for placement in a special needs trust.

sum of $190,000, payable to Larry, had been held in escrow by A & G since the 1996 settlement, pending the appointment of a guardian of the property of Larry.

Because the guardianship issue was pending in both juvenile court, pursuant to Brault's petition, and in the Orphans' Court, pursuant to Sargent's petition to appoint Witherspoon's mother and the bank, and the CINA Case was pending in circuit court, the Orphans' Court transferred Sargent's petition to the circuit court. Shortly thereafter, a Juvenile Court Master denied Brault's petition on the grounds that the juvenile court lacked jurisdiction over guardianship of property. Brault filed exceptions and a memorandum that detailed her concerns relating to possible conflicts of interest on the part of A & G regarding the settlement of the Maryland Malpractice Case. She asserted that Judge Ahalt's chambers advised her that Judge Ahalt was never told about the CINA Case and related facts.

At this point, as previously mentioned, A & G moved to intervene in the CINA Case to explain how the settlement in the Maryland Malpractice Case was achieved and how the proceeds were disbursed. In its motion, A & G took issue with Brault's suggestion of impropriety by A & G in connection with the settlement and disbursement of proceeds. A & G sought a hearing to "respond to the serious allegations of wrongful conduct charged by" Brault.

At the circuit court hearing on these matters before the Honorable G.R. Hovey Johnson on February 14, 1997, Judge Johnson expressed concern over A & G's dual representation of Witherspoon and Larry under the circumstances, as well as A & G's failure to distribute Larry's settlement proceeds when the settlement occurred in June 1996. Judge Johnson, presented with a motion to consolidate the proceedings for the purpose of appointing a guardian for Larry's property, consolidated the Maryland Malpractice Case, the CINA Case, and the Guardianship Case. He appointed Nancy L. Miller, Esq. (Miller) as counsel in the Guardianship Case and Mitchell Y. Mirviss, Esq. (Mirviss) as guardian of the property with instructions to collect all of Larry's property from A & G. The

judge also set a date for another hearing to allow A & G an opportunity to explain its actions and present argument with respect to the issues that had been raised.

Shortly thereafter, Mirviss learned of the pending settlement in the New York Malpractice Case and was advised by New York counsel that the case had been delayed for many months awaiting the appointment of a guardian in Maryland. When New York counsel wrote to the New York judge asking for approval of the settlement now that a Maryland guardian was appointed, Mirviss sought and was granted permission from the Prince George's County Circuit Court to intervene in the New York Malpractice Case. Thereafter, Mirviss sought access to the files of both New York and Maryland counsel in the Malpractice Cases in order to determine whether the proposed settlement was in Larry's best interest. A & G opposed the motion arguing that no investigation was necessary and that the guardian's effort to expand his authority was unwarranted. Witherspoon also opposed the guardian's motion and sought to remove Mirviss as guardian, and substitute her mother and a bank as co-guardians.

At the April 3 hearing Judge Johnson scheduled to allow A & G an opportunity to explain its actions regarding Larry's settlement, Trpis testified that he told Judge Ahalt that Larry lived in a foster home under the protective supervision of DSS, but had not disclosed that Larry had been adjudicated a CINA; that Larry had separate CINA counsel, or that Larry was committed to DHMH and placed under its limited guardianship. When A & G attorney LaCivita testified, he was unable to explain why A & G failed to distribute Larry's $190,000 settlement proceeds, other than to attribute such failure to "delays" in the CINA process, such as the time expended to obtain a psychological assessment of Witherspoon. He deferred most questions regarding the delay to Sargent asserting that Sargent had been delegated responsibility for that process.

During a two-week adjournment of the hearing, A & G responded in writing to a report that Miller submitted criticizing A & G for conflicts of interest and misrepresentations

made to the court and defense counsel in the Malpractice Cases. In an affidavit, LaCivita recanted his testimony that Sargent had been responsible for the delays in distributing Larry's proceeds. He provided no further explanation of such delays.

Upon resumption of the hearing, A & G opposed the guardian's proposed investigation of the settlements in the Malpractice Cases. A & G argued that the court lacked power to order any investigation of its representation of Larry. Judge Johnson rejected this argument and granted the guardian's motion, directed A & G not to obstruct the investigation, and ordered full access to A & G's files pertaining to Larry.

When the guardian served A & G with discovery subpoenas several days later, A & G produced many documents, but withheld twenty-four items claiming attorney-client privilege and work product doctrine. According to A & G's privilege log, the documents retained fell within the following categories: 1) written communications between A & G and Sargent or Witherspoon concerning guardianship and CINA matters; 2) A & G's notes regarding its representation of Witherspoon's claims in the Malpractice Cases; 3) A & G draft guardianship materials prepared for Sargent to file on behalf of Witherspoon and Larry in the Guardianship Case; and 4) notes regarding the CINA Case. After failing to resolve the dispute over A & G's refusal to disclose these documents, the guardian moved to compel production. After a hearing, the circuit court rejected A & G's claims of privilege and ordered that none of the requested documents could be withheld from Larry's representatives.

## DISCUSSION

### I.

### Was the Order Requiring That A & G Disclose Documents in its Possession a Final Order Subject to Immediate Appeal?

Appellee argues that the Order directing the disclosure of documents by A & G is an interlocutory discovery order, not a

final judgment, and, accordingly, it does not qualify under Maryland's collateral order doctrine allowing certain appeals from non-final judgments. Appellant contends that it has a right to appeal from the Order under the collateral order doctrine because A & G was not a party to the proceedings below.

The right of appeal is defined by statute. Section 12–301 of the Courts and Judicial Proceedings Article provides that "a party may appeal from a final judgment...."[5] A final judgment is statutorily defined as "a judgment, decree, sentence, order, determination, decision, or other action by a court ... from which an appeal ... may be taken." CJ § 12–101(f). "[A]s this definition implies, it is ultimately for [the Court of Appeals] to decide which judgments or orders are final and therefore appealable under section 12–301." *Peat, Marwick, Mitchell & Co. v. Los Angeles Rams Football Co.,* 284 Md. 86, 91, 394 A.2d 801 (1978).

The Court of Appeals has recognized that

the question of '[w]hether a judgment is final is not always readily capable of delineation' ... [but] as a general rule ... in order to be appealable a 'judgment must be so final as to determine and conclude rights involved, or deny the appellant means of further prosecuting or defending his rights and interests in the subject matter of the proceeding.'

*Id.* (quoting *United States Fire Ins. v. Schwartz,* 280 Md. 518, 521, 374 A.2d 896 (1977) (citations omitted)). Judicially excluded from the requirement that a judgment be final in order to be appealed are orders falling within the "collateral order exception." *Id.* This exception was first articulated by the Supreme Court in *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See id.* at 92, 394 A.2d 801. To fall within the exception, the order must

---

**5.** Appeals from certain interlocutory orders are also allowed by statute. *See* CJ § 12–303. The Order appealed from in this case does not fall within the types of orders from which appeal is authorized under this statute.

meet four requirements: "(1) it must conclusively determine the disputed question; (2) it must resolve an important issue; (3) it must be completely separate from the merits of the action; and (4) it must be effectively unreviewable on appeal from a final judgment." *Montgomery County v. Stevens,* 337 Md. 471, 477, 654 A.2d 877 (1995) (quoting *Town of Chesapeake Beach v. Pessoa Constr. Co., Inc.,* 330 Md. 744, 755, 625 A.2d 1014 (1993)). "The purpose [of the finality rule] 'is to combine in one review all stages of the proceeding that effectively may be reviewed and corrected if and when final judgment results.'" *Sigma Reprod. Health Ctr. v. State,* 297 Md. 660, 668, 467 A.2d 483 (1983) (quoting *Cohen,* 337 U.S. at 546, 69 S.Ct. at 1225).

Applying the rules and principles stated above, we hold that the lower court's Order is presently appealable under a final judgment analysis [6] or, in the alternative, as a collateral order. *See Town of Chesapeake Beach,* 330 Md. at 754, 625 A.2d 1014 (order held appealable because it was either a final judgment or a collateral order). We explain.

It is helpful to recap the procedural posture of the three cases at the time Judge Johnson ordered A & G to produce the documents. The three cases ordered consolidated were: 1) the Maryland Malpractice Case; 2) the CINA Case in which Brault sought a guardian of Larry's property; and 3) the Guardianship Case in which Witherspoon sought to have her mother and a bank appointed guardian.[7] The only interest that A & G has in any of the three cases involves Judge

---

**6.** The lower court did not direct the entry of a final judgment, but had the discretion to do so pursuant to Md. Rule 2–602(b) because the Order adjudicates all of the claims against A & G. For the reasons stated in this Opinion, we find no just reason for delay in considering this appeal and direct the entry of a final judgment pursuant to the discretion accorded to us in Md. Rule 8–602(e)(1)(C).

**7.** It is clear that the Guardianship and CINA Cases were open cases at the time of the consolidation order; the Maryland Medical Malpractice Case appears to have been closed when Judge Ahalt approved the settlement in May 1996. The parties do not raise, and we find it unnecessary to address, the correctness of the order to consolidate two pending cases with a case that was closed.

Johnson's Order to produce documents. If the documents the guardian seeks to obtain are disclosed, A & G's interest in the consolidated cases will end. Nevertheless, the Guardianship and CINA Cases will likely continue on, addressing issues involving Larry's care and the management of Larry's funds, without involving A & G. Although it is clear from the record that the guardian anticipates that Larry might have a cause of action against A & G for malpractice arising from a conflict of interest relating to the settlement of the Malpractice Cases, such action would not be brought in any of the three consolidated cases. Rather, such action would necessitate a new suit naming A & G as a defendant alleging a cause of action against A & G. Thus, regardless of whether the guardian decided to bring such action after receiving the documents requested, the Order directing that A & G disclose these documents ended the current controversy between the guardian and A & G.

Because the controversy between the guardian and A & G was ended by the issuance of the Order, the Order possessed the attributes of a final judgment. *See Baltimore City Dept. of Soc. Servs. v. Stein*, 328 Md. 1, 13, 612 A.2d 880 (1992). In *Stein*, the Court of Appeals allowed an appeal by DSS from an order requiring that it disclose records in its possession relating to a child who was the plaintiff in a lead paint case. The order enforced a subpoena duces tecum issued to DSS by the defendant in the case. In holding that DSS was entitled to immediately appeal the order requiring disclosure, the Court explained that DSS had no

> stake or interest, as a legal matter, in the merits of the tort action. . . . With regard to the appellant [DSS] and the appellee [Stein], the ruling has all of the attributes of finality recognized by this Court: it settles the rights of the appellant and appellee in the records sought to be discovered, thereby, concluding that phase of the action, and it has been entered on the docket.

*Id.*

Appellee argues that "neither third-party discovery nor attorney-client privilege claims may be raised under Mary-

land's collateral order doctrine." It is correct that the Court of Appeals has held that "discovery orders, being interlocutory in nature, are not ordinarily appealable prior to a final judgment. . . ." *Stevens,* 337 Md. at 477, 654 A.2d 877. Further, the Court of Appeals has followed the Supreme Court's decision in *Alexander v. United States,* 201 U.S. 117, 26 S.Ct. 356, 50 L.Ed. 686 (1906), holding that there is generally no appeal from an order enforcing a subpoena duces tecum unless the witness has refused to testify and been held in contempt. *See Stein,* 328 Md. at 14, 612 A.2d 880. The Court in *Stein* explained, however, that Maryland has not *fully* adopted this rule, saying that "[w]e have declined to follow the *Alexander* rule, at least when, in the procedural posture of the case, the only matter before the trial court is the discovery order, *i.e.* the motion to quash." *Id.* at 16, 612 A.2d 880.[8] The Court found precedent for this exception to the *Alexander* rule in its earlier decision in *Unnamed Attorney v. Attorney Grievance Comm'n,* 303 Md. 473, 494 A.2d 940 (1985).

In *Unnamed Attorney,* the appellant, who was the subject of an investigation by the Attorney Grievance Commission (AGC), was subpoenaed by the AGC to produce certain documents. He refused and filed an action in circuit court seeking a protective order protecting him from having to disclose the documents. The AGC then filed a motion to hold the attorney in contempt for his failure to produce the documents. "The circuit court treated the contempt motion as part of the same case as the motion for a protective order," and set a hearing on both motions. *Id.* at 477–78, 494 A.2d 940. At the hearing, the AGC did not request that a finding of contempt be made, and no finding on the issue of contempt was made. Subsequently, the circuit court ordered the attorney to produce certain documents. The Court of Appeals rejected the AGC's contention that the order appealed from was interlocutory

---

**8.** The Court concluded that *Stein* did not fall within the exception to the *Alexander* rule in part because "the proceedings out of which it arose are still pending before the trial court." *Id.* at 17, 612 A.2d 880.

because the AGC proceeding was still pending and no contempt order had been entered. It reasoned:

> It has consistently been held in this State that where a court proceeding is commenced to quash or to enforce a ... subpoena ... issued by an administrative agency or official, where the court refuses to quash or orders enforcement, and where the court's order terminates the *court* proceeding, the order is final and appealable. The fact that the *administrative* proceedings may not be terminated does not render the court order interlocutory if nothing remains to be done in the trial court.

*Id.* at 480, 494 A.2d 940. Although the Order in the present case does not arise from circuit court proceedings brought *only* to block the enforcement of an administrative subpoena as in *Unnamed Attorney,* we see sufficient similarity between the cases to convince us to apply the same rule.

█ As indicated earlier, the only relief sought by the guardian against A & G is the disclosure of documents. If such disclosure occurs, there will be no issue to resolve regarding the guardian and A & G in either of the two open cases. Although the guardian may, based in part on the documents received, decide to proceed with a suit against A & G for malpractice, such cause of action would not be a part of either of the two open cases,[9] and would properly be instituted as a separate case. The Guardianship and CINA Cases will likely continue on for a lengthy period as the circuit court continues to periodically monitor the care of Larry and the management and distribution of his assets. If A & G were denied the present appeal, it is difficult to say when, if ever, A & G would have an opportunity to appeal from the Order. For these reasons, we exercise our discretion under Rule 8–

---

9. ·The guardian has suggested that he might seek to re-open the Maryland Malpractice Case to modify A & G's fee, presumably based on a theory of extrinsic fraud associated with the alleged failure to disclose to the court that Larry's interests might depart substantially from those advanced by his mother. We express no opinion on whether the Maryland Malpractice Case, and the judgment entered therein, could be re-opened and the judgment therein revised under such a theory.

602(e) to conclude that the Order was a final judgment within the meaning of CJ § 12–301.

Because of the unusual procedural posture of this case, the Order can alternatively be viewed as falling within the collateral order exception. As indicated above, four requirements must be met to apply this doctrine. We consider each, although not in their previously listed sequence, below. Clearly, the first requirement is met because the disputed question is whether A & G must turn over to the guardian documents it claims are privileged, and the Order unequivocally directs that it do so.

The fourth requirement, that the order be effectively non-reviewable on appeal from a final judgment, is also satisfied because a reversal of the Order on appeal cannot undo what will have already taken place: the disclosure of documents that A & G contends is subject to the attorney-client and work product privileges. Regarding the second factor, the United States Court of Appeals for the Third Circuit clarified the importance requirement when it explained:

Importance has a particular meaning in this context. It does not only refer to general jurisprudential importance. Rather, the overarching principle governing "importance" is that, for the purposes of the *Cohen* test, an issue is important if the interests that would potentially go unprotected without immediate appellate review of that issue are significant relative to the efficiency interests sought to be advanced by adherence to the final judgment rule.

*In re Ford Motor Co.*, 110 F.3d 954, 959 (3d Cir.1997). The importance determination is "a function of a balancing process." *Id.* at 960. "[A] court must look to the competing considerations that underlie questions of finality, namely 'the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other.'" *Id.* (quoting *Johnson v. Jones*, 515 U.S. 304, 305, 115 S.Ct. 2151, 2153, 132 L.Ed.2d 238 (1995)).

In describing the importance of the attorney-client privilege, appellant aptly quotes the Supreme Court in saying

that the privilege "is one of the oldest recognized privileges for confidential communications ... intended to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Swidler & Berlin v. United States*, 524 U.S. 399, ——, 118 S.Ct. 2081, 2084, 141 L.Ed.2d 379 (1998). Although the general importance of the privilege is a consideration, the mere assertion of the attorney-client privilege will not necessarily satisfy the "importance" criteria in determining the collateral order exception. *See Electronic Data Sys. Fed. Corp. v. Westmoreland Assocs., Inc.*, 311 Md. 555, 556, 536 A.2d 662 (1988) (interlocutory order of trial court compelling production of documents alleged to be privileged under the attorney-client relationship was not appealable under the collateral order doctrine);[10] *see also In re Ford*, 110 F.3d at 959; *Melia v. Hartford Fire Ins. Co.*, 202 Conn. 252, 520 A.2d 605, 607 (1987) (the "occasional violation of the attorney-client privilege that cannot be fully rectified upon review of the final judgment is a lesser evil than that posed by the delay in the progress of cases in the trial court likely to result from interlocutory appeals of disclosure orders."); *In re Rinehardt*, 575 A.2d 1079, 1081 (Del.Supr.Ct.1990) ("proscription against appellate review of interlocutory orders ... does not change merely because the discovery/disclosure order implicates the attorney-client privilege."); *Lewellyn v. Bell*, 635 A.2d 945, 948 (Me.1993) (quoting *Melia* in dismissing appeal asserting that discovery order violated attorney-client privilege). In making the importance determination, we should consider the asserted privilege in the context of the particular case.

The Supreme Court has explained that piecemeal review "can make it more difficult for trial judges to do their basic job—supervising trial proceedings [and] can threaten those proceedings with delay, adding costs and diminishing coherence." *Johnson*, 515 U.S. at 309, 115 S.Ct. at 2154. Under the circumstance of the present case, however, the cost of

---

10. The Court issued an order, but no opinion in this case.

piecemeal review is not high because there is no trial pending that is delayed awaiting appellate resolution of the appeal.[11] Thus, in balancing the costs of a piecemeal review against the danger of denying justice by delay, we conclude that the Order is sufficiently important to meet the importance requirement.

The third requirement is that the order be completely separate from the merits of the action. As we stated above, the issue presented here of whether A & G must disclose certain documents to the guardian is not related to the issues to be addressed in the ongoing Guardianship or CINA Cases. The Guardianship Case will involve ongoing reports by the guardian to the court about Larry's assets, how they are invested, and distributions for Larry's benefit. The case may, also involve a request by the guardian for court authorization to file suit against A & G. But the guardian's request to file a suit against A & G and the court's consideration of that request are separate from the merits of any actual suit filed because the merits would not be decided in the Guardianship or CINA Cases.

For the reasons stated above, we hold that the Order is appealable, and appellant's appeal from the Order should be addressed on its merits.

## II.

### Did the Circuit Court Have Jurisdiction Over A & G?

Appellant argues on appeal that the circuit court did not have the authority to order A & G to produce its files relating to Larry because: 1) A & G was not a party to the proceeding; and 2) there was no legal action pending in which A & G's representation of Larry was at issue. With respect to appellant's contention that it was not a party to any of the proceed-

---

11. Thus, this case is unlike *Sigma Reprod. Health Ctr.*, 297 Md. at 660, 467 A.2d 483, cited by appellee, in which the Court of Appeals held that the order to produce documents was not completely separate from the merits, and the appeal of that order would have delayed a scheduled trial. *See id.* at 666, 671, 467 A.2d 483.

ings, appellee responds that even if it only held a "non-party witness" status, A & G is not immune from its lawful discovery obligations under the Maryland Rules. While appellee may be correct in its response, we do not rest our decision on this ground because the record shows that A & G became a party when it entered its appearance in the CINA Case for the purpose of justifying its role in the settlement of the Maryland Malpractice Case. With respect to appellant's second argument, appellee responds that the circuit court, as an equity court with jurisdiction over Larry's property through the guardianship petition, and as a juvenile court with jurisdiction over Larry personally through the CINA petition, had clear authority to order discovery to protect his interests. We agree with appellee on this issue.

As indicated previously, A & G made a decision to protect its interests when Brault filed a motion in the CINA Case to appoint a guardian of Larry's property and made allegations suggesting that A & G acted improperly in its representation of Larry. A & G filed a motion to intervene solely on its own behalf and specified that its purpose for intervening was "for the limited purpose of explaining to the [c]ourt how the settlement in the [Maryland Malpractice Case] was achieved and how the proceeds of the settlement were disbursed." The Order directing that A & G disclose its files relating to Larry and the settlement of his case was *directly* relevant to that issue. A & G's position that it can intervene in a case to explain and justify its actions, but that the court has no jurisdiction to order discovery from it relating to that very issue, is remarkably myopic. A judicial proceeding is not akin to a press release, and does not present an opportunity for a party to make a controlled presentation of its side of an issue without subjecting itself to the usual scrutiny of relevant facts. In light of A & G's own articulation of its purpose in intervening in the CINA Case, we reject without hesitation A & G's argument that its files pertaining to Larry fall outside the proper scope of inquiry and discovery.

 Upon appointment, the guardian was vested with title to all of Larry's property. *See* Md.Code (1974, 1991 Repl.Vol.), § 13–206(c) of the Estates and Trust Article (hereinafter ET). The guardian also held the authority to prosecute any actions, claims, or proceedings for the protection of the fiduciary estate. *See* ET §§ 15–102(p), 13–213. One of the duties of the guardian was to identify and account for all of the assets of Larry. *See* ET § 13–209; Md. Rule 10–706. Eight months had expired since the settlement of the Maryland Malpractice Case and Larry's monthly annuity was still being held by the insurance company pending appointment of a guardian. Also, his cash settlement was still being held by A & G for the same reason. Final settlement of the New York Malpractice Case was delayed for months awaiting the appointment of a guardian in Maryland. A & G's *only* action to have a guardian appointed for Larry was in *response* to Brault's motion to appoint herself or another qualified person as guardian. These facts alone gave the new guardian some reason to suspect that A & G may have acted in a manner detrimental to the best interests of Larry in arriving at the terms of the settlement in the Maryland Malpractice Case and distributing the funds. In addition, the guardian had reason to believe that A & G failed to disclose to Judge Ahalt, when requesting approval of the settlement of the Maryland Malpractice Case, that there was an issue raised in the CINA Case whether Witherspoon was physically and emotionally capable of caring for Larry and acting in his best interests in terms of his health and education. Witherspoon, with her parenting rights under challenge by DSS, may have developed a different interest from Larry in the Malpractice Cases. Apparently, A & G had not considered having a *guardian ad litem* appointed to represent Larry's interests before a settlement was reached involving both the claims of Witherspoon and Larry. Under these circumstances, the guardian certainly had justification, and probably a duty, to obtain information relating to the settlement. *See* ET § 13–212. Administering of the office of a guardian is subject to judicial control. *See Kicherer v. Kicherer,* 285 Md. 114, 119, 400 A.2d 1097 (1979).

The trial court's issuance of the Order to A & G to produce documents pertaining to Larry was simply an exercise of this control.

### III.

### Can A & G Withhold Documents Based on the Attorney–Client Privilege or Work Product Privilege?

A & G asserts that the twenty-four documents that it withheld were protected by either the attorney-client privilege or the privilege against disclosure of work product. Appellee responds that neither privilege applies to preclude production of documents to him because, as guardian, appellee stands in the shoes of Larry and neither privilege can be asserted to foreclose disclosure of these documents to Larry. We agree with appellee.

Appellant bears the burden of proving that the attorney-client privilege or work product protection applies. *See Maxima Corp. v. 6933 Arlington Dev. Ltd. Partnership*, 100 Md.App. 441, 456, 641 A.2d 977 (1994). This burden cannot be met by conclusory allegations or mere assertions. *See Suggs v. Whitaker*, 152 F.R.D. 501, 505 (M.D.N.C.1993). In its brief, appellant asserts that "each document withheld by A & G contains either communication between [Witherspoon] and her attorneys, or A & G's work product prepared in anticipation of litigation, and so are presumptively privileged from disclosure." Appellant refers us to the Revised Privilege Log, which contains a general description of each document, its author, and which privilege is claimed. Except for six documents [12], the documents withheld constitute or pertain to: 1) a communication between Witherspoon and A & G regarding Witherspoon's interest in the Malpractice Cases; 2) communication between Witherspoon and A & G regarding either

---

12. Apparently, these six documents were subsequently obtained by the guardian from other sources, and thus are not the subject of this appeal.

the CINA or Guardianship Cases; or 3) notes made by an A & G attorney relating to Witherspoon's interest in these cases.

## A. Attorney–Client Privilege

 Under the attorney-client privilege, confidential communications between clients and their attorneys are protected from disclosure. *See Trupp v. Wolff,* 24 Md.App. 588, 608–09, 335 A.2d 171 (1975). As indicated earlier, the rule rests upon a regard for the administration of justice, and the concept that without the privilege a client would be reluctant to make full and frank disclosure to his or her attorney and would thereby be deprived of the full benefit of the advice of a person skilled in jurisprudence. *See id.* (quoting *Greenough v. Gaskill,* 1 My. and K. 98). The privilege is not absolute, and as Professor Wigmore explained,

> 'There may be a relative, not an absolute confidence. The chief instance occurs when the same attorney acts for two parties having a common interest, and each party communicates with him. Here the communications are clearly privileged from disclosure at the instance of a third person. Yet they are not privileged in a controversy between the two original parties, inasmuch as the common interest and employment forbade concealment by either from the other.'

*Trupp,* 24 Md.App. at 611, 335 A.2d 171 (quoting 8 J. Wigmore, *Evidence* § 23–12 (McNaughton ed.) (emphasis omitted)). The more limited nature of the privilege, applicable when there are co-clients, has been almost universally recognized and is referred to as the "co-client exception" or the "limited privilege for co-clients." *See Valente v. Pepsico, Inc.* 68 F.R.D. 361, 368 (D.Del.1975) ("It is a common, universally recognized exception to the attorney-client privilege. . . ."); 5 Lynn McLain, *Maryland Evidence* § 503.11, at 494 (1987); Wigmore, *supra,* § 2312, at 603; Restatement (Third) of Law Governing Lawyers (Proposed Final Draft No. 1) (March 29, 1996) § 125, at 415 (characterizing the privilege as a "limited privilege for co-clients").

There is no dispute that Witherspoon and Larry had a common interest in the Malpractice Cases or that A & G was engaged to pursue those cases. Appellant argues that the co-client exception to this privilege does not apply to the present case because the documents in question do not represent or reflect communications made in the presence of both clients. It contends that *Trupp*, the only Maryland case discussing this exception, involved a communication made in the presence of both clients and that we should extend the exception no further. Appellee counters that the co-client exception to the privilege is widely recognized, has been applied in many instances when the communication in question was made outside the presence of the co-client, and should not be limited as appellant suggests. We agree with appellee.

The Supreme Court of Iowa in the seminal case addressing this issue, explained:

> [I]f it appears the secret or imparted communication is such that the attorney is under a duty to divulge it for the protection of the others he has undertaken to represent in the involved transaction, then the communication is not privileged. It would be shocking indeed to require an attorney who had assumed such a duty to act for the mutual benefit of both or several parties to be permitted or compelled to withhold vital information affecting the rights of others because it involves the informant.

*Henke v. Iowa Home Mut. Cas. Co.*, 249 Iowa 614, 87 N.W.2d 920, 924 (1958). The Iowa Supreme Court explicitly rejected the argument that the limitation on the privilege only applied when the communication in question was made in the presence of both clients. It reasoned:

> The duty of the attorney to disclose or protect the interest of each [client] is too great and too well settled for anyone to expect communications which will make impossible further efforts for the benefit of all by the attorney, to be privileged. The rule is based on much firmer ground than

waiver, that of duty, loyalty and fairness, as well as on substantial public policy.

*Id.* at 925; *see also Glacier Gen. Assurance Co. v. Superior Court of Los Angeles County,* 95 Cal.App.3d 836, 841, 157 Cal.Rptr. 435 (1979) (explicitly rejecting the view that both clients must be present); McLain, *supra,* § 503.11, at 494; Restatement (Third) of Law Governing Lawyers, *supra,* § 125, at 415.

Even cases that do not explicitly address whether the communication must be made in the presence of the co-client have stated the general limitation on the privilege for co-clients, without stating or implying the narrow interpretation urged by appellant. *See Pennsylvania Cas. Co. v. Elkins,* 70 F.Supp. 155, 157 (E.D.Ky.1947); *Chitty v. State Farm Mut. Auto. Ins. Co.,* 36 F.R.D. 37, 41 (E.D.S.C.1964); *Alexander v. Superior Court in and for Maricopa County,* 141 Ariz. 157, 685 P.2d 1309, 1315 (1984); *Gearhart v. Etheridge,* 232 Ga. 638, 208 S.E.2d 460, 461 (1974) (holding "[a]ll communications between the joint clients and the accountant are privileged as to all outside parties, but the privilege does not exist between the principles involved."); *Cousins v. State Farm Mut. Auto. Ins. Co.,* 258 So.2d 629, 635–36 (La.App.1972); *Dumas v. State Farm Mut. Auto. Ins. Co.,* 111 N.H. 43, 274 A.2d 781, 784 (1971); *Longo v. American Policyholders' Ins. Co.,* 181 N.J.Super. 87, 436 A.2d 577, 579 (Law Div.1981); *Estate of Swantee,* 90 Misc.2d 519, 394 N.Y.S.2d 547, 549–50 (1977); *Dobias v. White,* 240 N.C. 680, 83 S.E.2d 785, 788 (1954); *Netzley v. Nationwide Mut. Ins. Co.,* 34 Ohio App.2d 65, 296 N.E.2d 550, 561 (Ohio App.1971); *Horowitz v. Le Lacheure,* 81 R.I. 235, 101 A.2d 483, 487 (1953). Indeed, appellant cites no cases that support its claim that the privilege will bar disclosure to a co-client of communications made to the common attorney unless the co-client was present at the time of the communication.

We are persuaded by the reasoning set forth above in *Henke* that the principles of duty, loyalty, and fairness require that when two or more persons with a common interest engage an attorney to represent them with respect to that interest, the attorney privilege against disclosure of confidential communications does not apply between them, regardless of whether both or all clients were present during the communication. To hold otherwise would be inconsistent with the high level of trust that we expect in an attorney-client relationship.

In the present case, appellant was engaged to represent the common interests of Witherspoon and Larry with respect to the Malpractice Cases. Witherspoon's cause of action rested on proof of the same facts to support the defendants' liability that Larry's claim did, i.e. that he was injured because of the negligence of the defendant physicians.[13] Witherspoon and Larry also had a natural common interest arising from the parent-child relationship. *See Wolinski v. Browneller*, 115 Md.App. 285, 310, 313–319, 693 A.2d 30 (1997) (explaining that there is a presumption that a parent acts in the best interests of a minor child).

One category of the documents A & G withheld from disclosure constitutes communications between Witherspoon and appellant regarding the settlement of Witherspoon's portion of the Malpractice Cases. Appellant argues that because the communication pertained to Witherspoon's personal claim, and not to Larry's claim, the full attorney-client privilege applies. We disagree.

When an attorney represents two parties claiming damages against a third party, it is important that full disclosure regarding the terms of the settlement proposed for each be disclosed. *See* MRPC Rule 1.8(g) ("A lawyer who represents

---

13. Under Maryland law, Witherspoon only had separate claims for medical expenses incurred by her in connection with Larry's injuries and loss of Larry's services. *See Garay v. Overholtzer*, 332 Md. 339, 346, 631 A.2d 429 (1993).

two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients ... unless each client consents after consultation including disclosure of the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement."); *cf. Scamardella v. Illiano,* 126 Md.App. 76, 85–86, 727 A.2d 421 (1999). As we indicated earlier, a parent is presumed to act in the best interests of his or her child. Witherspoon engaged A & G to prosecute the civil cases for her and her son's damages caused by the physicians' negligence in diagnosing her son's medical condition. She apparently had an expectation that she would be acting as trustee for her son with respect to the proceeds of the settlement in the case. Under the present circumstances, we hold there could have been no reasonable expectation on the part of Witherspoon that her communications with A & G regarding her own portion of the settlement would be kept confidential from Larry or his representatives.

 Another category of documents withheld from disclosure were documents pertaining to A & G's communications with Witherspoon regarding the CINA Case. These documents include a letter written after A & G withdrew from representation of Witherspoon regarding "doctors' evaluations of [Witherspoon]; undertaken in connection with CINA and guardianship proceedings." Also withheld was the draft of a petition for guardianship of Larry prepared by A & G. There could be no reasonable expectation on the part of Witherspoon that her communications with A & G regarding a proceeding brought to determine whether Witherspoon was capable of providing adequate care for her son in light of the injuries arising from the physicians' negligence would be kept confidential from her son or those protecting his interests. She engaged A & G to represent her and Larry in the Malpractice Cases; the CINA Case was brought because of the difficulty that Witherspoon had in providing care for Larry's special needs. We cannot countenance a doctrine that would allow A & G or Witherspoon to hide from Larry's court appointed representatives information about Witherspoon's *own* mental

and physical health when that concealment could be detrimental to Larry's welfare. The same holds true with respect to any other communications she had with A & G regarding the CINA Case. If she wished to have confidential communications with a lawyer regarding her own rights as a parent, then she should have chosen attorneys other than those already representing her son. This is a clear case where the two clients should have nothing to hide from one another.

Appellant next argues that the co-client exception to the attorney-client privilege is not applicable because "there must be actual, legal adversity between former co-clients for the co-client exception to apply." Appellant cites Wigmore, *supra,* § 2312 and Restatement (Third) of Law Governing Lawyers, *supra,* § 125 for the proposition that the co-client exception operates to preclude former co-clients from asserting the attorney-client privilege *only* when they become adverse in a subsequent proceeding. A & G contends that Witherspoon and Larry have no adverse proceeding between them. Appellee replies that Witherspoon and Larry "have been engaged in adversarial litigation ever since the CINA petition was filed in October 1992." He points to the cross-examination of Witherspoon by Larry's court appointed lawyer in 1995, the court's removal of certain visitation and guardianship rights from Witherspoon at the behest of Brault, the guardian's efforts to block Witherspoon from obtaining for her own use an extra $150,000 in settlement proceeds from the New York Malpractice Case, and Brault's efforts to have a guardian appointed for Larry other than Witherspoon. Appellee is correct that these aspects of the ongoing litigation constituted adversarial proceedings between Witherspoon and Larry. Brault was the court-appointed attorney for Larry in the CINA Case. Under these circumstances, the actions that she took should be considered the actions of Larry.

The most appropriate response to appellant's argument, however, is that it has misconstrued what the commentators and courts mean they refer to co-clients who become adverse to one another. Wigmore states that attorney-client commu-

nications are not privileged "in a controversy between the two original parties, inasmuch as the common interest and employment forbade concealment by either from the other." Wigmore, *supra*, § 2312, at 603–04. The Restatement says:

> If two or more persons are jointly represented by the same lawyer in a matter, the communications of each co-client with the lawyer or other privileged person that otherwise qualify as privileged . . .:
>
> (1) Are privileged as against a third person, and any co-client may assert the privilege; but
>
> (2) Unless the co-clients have explicitly agreed otherwise, are not privileged as between the co-clients in subsequent litigation between them.

Restatement (Third) of Law Governing Lawyers, *supra*, § 125. The references by Wigmore, the Restatement, and the cases to subsequent litigation or controversy between co-clients simply place in context how the co-client privilege issue arises. If there is no controversy between the co-clients, they can both consent to disclosure and the issue of the attorney-client privilege does not arise. The rationale for allowing disclosure of an attorney-client communication *even when* the parties become adverse is the common interest they shared and the expectation that the attorney was engaged to act on behalf of both parties respecting all matters connected with that common interest. Thus, the foundation for the disclosure exists from the beginning; it does not arise just when they become adverse to each other.

### B. Work Product Privilege

Appellant's alternate ground for withholding the subpoenaed documents is that the documents are protected from discovery under the work product doctrine. Its assertion of this doctrine is without merit for reasons similar to those we explained previously regarding the attorney-client privilege. The work product doctrine was developed because of a concern that without some protection, discovery rules and procedures would damper an attorney's ability to keep an adversary from learning about and therefore undermining trial prepara-

tion and tactics. As we explained in *Shenk v. Berger,* 86 Md.App. 498, 587 A.2d 551 (1991):

> The central policy underlying the doctrine is the preservation of the attorney's adversarial role, the premise being that promotion of adversary preparation ultimately furthers the truth-finding process. In his concurrence [in the seminal case of *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)], Justice Jackson eloquently captured the essence of this policy, '[d]iscovery is hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary.' Other justifications, which include, *inter alia,* attorney laziness, inefficiency, and misleading discovery responses, are off-shoots of the primary adversarial concern.

*Id.* at 503, 587 A.2d 551 (citations omitted).

The underpinning of the doctrine was similarly explained by the Supreme Court of Illinois as one that "provides a broader protection than the attorney-client privilege, and is designed to protect the right of an attorney to thoroughly prepare his case and to preclude a less diligent adversary attorney from taking undue advantage of the former's efforts." *Waste Management, Inc. v. Int'l Surplus Lines, Ins. Co.,* 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322, 329 (1991) (citing *Hickman,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451). Thus, the focus of the work product doctrine is non-disclosure to one's *adversary.* The United States Court of Appeals for the Fifth Circuit rejected an attorney's claim that he could assert the work product doctrine to bar his own former client from access to documents prepared while that client was in litigation with a third party. *See Spivey v. Zant,* 683 F.2d 881 (5 th Cir.1982). In so doing, the Fifth Circuit explained:

> The work product doctrine pertains to materials prepared by an attorney in preparation for litigation when the materials are sought by an adversary of the attorney's client. Fed.R.Civ.P. 26(b)(3) speaks of 'documents and tangible things ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's

representative. . . .' Thus, the work product doctrine does not apply to the situation in which a client seeks access to documents or other tangible things created or amassed by his attorney during the course of the representation.

*Id.* at 885.

Maryland Rule 2–402(c) contains comparable language to that quoted from Fed.R.Civ.P. 26(b). The Federal District Court for the Southern District of New York in *Martin v. Valley Nat. Bank of Az.*, 140 F.R.D. 291 (S.D.N.Y.1991) explained this rule:

This result is hardly surprising in view of the evident inapplicability of the rationale for the work-product rule to an attorney's efforts to withhold the fruits of his professional labors from the client, who presumably paid for and was the intended beneficiary of those labors. . . . Having been hired to serve the client, the attorney cannot fairly be authorized to subvert the client's interests by denying to the client those work papers to which the client deems it necessary to have access.

*Id.* at 320; *accord Clark v. Milam*, 847 F.Supp. 424, 426 (S.D.W.Va.1994) (explaining that courts addressing this issue have concluded that work product immunity cannot apply when a client seeks documents created for him by his own lawyer); *Gottlieb v. Wiles*, 143 F.R.D. 241, 247 (D.Colo.1992); *Roberts v. Heim*, 123 F.R.D. 614, 631 (N.D.Cal.1988) ("no public policy considerations have been articulated by defendants which would support an assertion of work-product privilege by any attorney to the detriment of his client."); *In re Standard Fin. Management Corp.*, 79 B.R. 97, 99 (Bankr. D.Mass.1987); *see also* Edna Selan Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine*, 425–26 (3d ed.1997); 2 Paul J. Bschorr & John F. Collins, *Business and Commercial Litigation in Federal Courts*, § 18.7 (Robert L. Haig ed.1998); *cf. Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn, L.L.P.*, 91 N.Y.2d 30, 666 N.Y.S.2d 985, 689 N.E.2d 879, 883 (1997) ("Barring a substantial showing by the [lawyer] of good cause to refuse client access, [clients]

should be entitled to inspect and copy work product materials, for the creation of which they paid during the course of the firm's representation."). *But see Federal Land Bank v. Federal Intermediate Credit Bank,* 127 F.R.D. 473, 479–80, *aff'd in part, rev'd in part,* 128 F.R.D. 182 (S.D.Miss.1989) (client has right to "end product" of attorney's services, but not work product leading thereto); *Corrigan v. Armstrong, Teasdale, Schlafly, Davis & Dicus,* 824 S.W.2d 92, 97 (Mo.App.1992) (attorney "may retain papers relating to the client to the extent permitted by other law.").

 Nor does appellant gain any ground by claiming that the documents are work product prepared in the course of representing Witherspoon. We have already discussed, in the context of the attorney-client privilege, the undertaking of a lawyer who represents multiple clients with a common interest. It is only logical that if communications to an attorney representing two parties with a common interest are not privileged because of the duty of loyalty owed by the attorney to both clients and the absence of any reasonable expectation of confidentiality, the work product of the attorney relating to one of two such clients is similarly not barred from disclosure to either client. The underlying rationale for the work product doctrine, to prevent adversary counsel from appropriating the product of an attorney's work, is inapplicable when considering disclosure to a co-client for the same reasons that it is inapplicable when considering disclosure to the single client.

### Conclusion

For the reasons stated, we hold that neither the attorney-client privilege nor the work product doctrine bars disclosure to the guardian of the documents withheld by A & G. Accordingly, Judge Johnson's Order directing disclosure of such documents is affirmed.

**ORDER OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**