747 A.2d 702

**Timothy Edward BLAIR**

v.

**STATE of Maryland.**

**No. 5645, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

March 6, 2000.

Rebecca Buhner (Student Attorney under Rule 16) (Stephen E. Harris, Public Defender and Martha Weisheit, Assistant Public Defender, on the brief), Baltimore, for Appellant.

Stephen L. Holcomb, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Sandra A. O'Connor, State's Attorney for Baltimore County, Towson, on the brief.), for appellee.

Argued before MURPHY, C.J., and HOLLANDER and ADKINS, JJ.

HOLLANDER, Judge.

This case arises out of the murder of Edward Fissell, who was shot and killed outside his home in Baltimore County on January 27, 1997. Timothy Blair, appellant, John Fleig, and James Fitzpatrick were all charged with the murder. Pursuant to a plea agreement, Fleig pleaded guilty on October 15, 1997, to the charge of accessory after the murder, and he agreed to testify against Blair and Fitzpatrick. Beginning on September 28, 1998, appellant was tried before a jury in the Circuit Court for Baltimore County.[1] Blair was acquitted of first degree murder, but he was convicted of second degree murder, use of a handgun in the commission of a felony, and use of a handgun in the commission of a crime of violence. He was subsequently sentenced to thirty years of incarceration for the murder conviction and to a consecutive eight year term for the felony handgun offense. The other handgun offense merged for sentencing purposes.

On appeal, all of the issues raised by appellant relate to Fleig and Fleig's attorney. Blair presents three questions for our consideration, which we have rephrased and reordered:

I. Did the court err by permitting Fleig's lawyer to testify that Fleig's statements to him during client interviews were consistent with Fleig's subsequent statements to the police and with his testimony at Fitzpatrick's trial?

II. Did the court err by permitting the State to rehabilitate Fleig's testimony by introducing the entire transcript of his interview with the State?

III. When Fleig's attorney testified, did the court err in refusing to permit defense counsel to review, for

---

1. The court denied the State's motion to join Fitzpatrick's case for trial with Blair. Fitzpatrick was tried in April 1998.

purposes of cross-examination, the notes that Fleig's lawyer had taken during interviews of his client?

For the reasons discussed below, we shall vacate the convictions and remand for further proceedings.

## FACTUAL BACKGROUND

At the time of the killing, Fissell was living in a trailer located on land that abuts the Back River in Edgemere. A small home is also situated on the property (collectively, the "Shore Property"). The Shore Property served as a summer retreat for members of an extended family that included Fissell, Blair, and Fitzpatrick. Blair's father and Fitpatrick's father are half brothers; both were Fissell's stepbrothers. Blair and Fitzpatrick referred to Fissell as "Uncle Eddie." Fissell lived at the Shore Property year-round, maintaining it and supporting himself through various odd jobs.

Animosity existed between Fissell and several of the younger adult members of the family, including appellant, who was about 28 years old at the time of trial. Indeed, Blair and Fissell argued on a number of occasions. Moreover, evidence was presented at trial that some of the young adult family members had harassed Fissell and vandalized the Shore Property. Consequently, the family's older members instituted a rule that Blair, Fitzpatrick, and the other younger adult family members could not visit the Shore Property without the older adults. Despite this prohibition, Blair and Fitzpatrick went to the Shore Property on the morning of the murder.

Mahlon Thomas lived next door to Fissell. He testified that he was awakened at approximately 1:45 a.m. on January 27, 1997, by his dog's barking. Although it was too dark for him to see what was happening, Thomas stated that he heard a commotion outside. He then heard Fissell shout the name "Timmey," followed by two gunshots. Thomas's son, Forrest, discovered Fissell's body later that morning. According to Dr. David Fowler, a deputy chief medical examiner, Fissell had been shot once in the head and once in the neck. The gunshot wound to the neck revealed stippling, indicating that

the gun had been fired at close range. Fissell had also suffered various blunt force contusions and abrasions shortly before his death.

Fleig's testimony is central to the issues raised by appellant. According to Fleig, at approximately 4:30 p.m. on January 26, 1997, he picked Blair up at a house in Dundalk that Blair shared with his cousin, Rose Perry. The two men then drove to Essex to attend a Super Bowl party in the basement den of Fitzpatrick's home. Toward the end of the party, Blair began to argue with Edwin Schwinn, another guest. The argument quickly escalated into a shouting match. Fitzpatrick subsequently "put them out in the yard," where Blair and Schwinn continued to quarrel. Soon thereafter, Blair struck Schwinn in the face, knocking him to the ground, and delivered several more blows.

After the fight, Fleig, Blair, and Fitzpatrick returned to the basement. Blair then left the den for a short time to call Fissell. The following colloquy is relevant:

[FLEIG:] ... Blair came downstairs highly agitated and slammed something down on the table that had the buffet food on it and just started ranting and raving about his uncle.

[PROSECUTOR:] Well, what did he say?

[FLEIG:] That he had gone too far this time and he was fed up with him and he was an MF"r and they began to go on and on about some of the things that they would repeatedly say about their uncle, that he was gay and that he was worthless and he was a drunk and he was crazy and didn't deserve to live anymore.

* * *

[PROSECUTOR:] What did he say that caused him to be so agitated?

[FLEIG: Appellant] said something about that Uncle Eddie had said he couldn't go to the shore anymore and that [appellant] caused too much trouble and that his uncle had spoken to [appellant's] father and [appellant's] father said

that if there was any more problems to just call the police because he washed his hands of the whole thing, he was just tired of the fighting between [appellant] and the uncle.... [2]

A discussion ensued between Blair and Fitzpatrick that eventually degenerated into a series of insults about Fissell. Blair was determined to go down to the Shore Property and "get even." According to Fleig, Fitzpatrick and Blair devised a plan whereby Fitzpatrick would bang on the door to Fissell's trailer to lure him outside. Blair would then "hit [Fissell] from behind over the head with a shovel or whatever they could find," driving Fissell to the ground, and Fitzpatrick would take the shovel and decapitate him.

Fleig agreed to drive Blair and Fitzpatrick to the Shore Property. He testified that he did not think either Blair or Fitzpatrick "were all that serious," and he hoped to "diffuse the situation." Blair rode in the front passenger seat with Fitzpatrick immediately behind him.

During the fifteen-minute ride to the Shore Property, Blair and Fitzpatrick discussed their plan. In response to a question from the State as to what comments Fleig added to the discussion, Fleig said:

> [T]he conversation was just going on and on, going on, rehashing—it was just rude and it was tacky, it was disgusting, I was sick of hearing about it and I said, look, you know, what if he doesn't die right away. You can't be doing that to that old man. I said you all just getting too disgusting [sic]. You could at least have enough respect for him to shoot him....

Blair then asked Fleig whether he had his gun with him, and began to lean toward the driver's seat. Fleig owned a .380 Davis Semi–Automatic handgun that he ordinarily kept under the driver's seat. Fleig reached down and grabbed the gun and held it out to Blair, who took it and tossed it around.

---

**2.** Blair's father testified that he received a telephone call from Fissell at approximately 1:30 a.m. on January 27, 1997.

Blair then gave it to Fitzpatrick, who attempted to fire it out of the rear window. When the attempt failed, Fitzpatrick tossed the gun into the front seat and Blair picked it up. Fleig testified that he took the gun from Blair, engaged the clip, returned it to Blair, and Blair then handed the gun to Fitzpatrick, who fired it. The plan to kill Fissell then came to include Fleig's gun.

"About a city block" from the Shore Property, Fleig turned off the car's headlights and backed into a small enclave. According to Fleig, after the three men sat in silence "for a minute," Blair said "let's do it." Blair and Fitzpatrick left the car; Fitzpatrick was holding the gun. Fleig lost sight of the men in the darkness. Several minutes later, Fleig heard gunshots. Blair and Fitzpatrick subsequently returned to the car; Fitzpatrick still had the gun. Fleig testified that Blair "was just really hyper and full of—lot of energy. He said, did you see me, did you see me, I can't believe we did it, we did it. . . ." Fleig then began to drive back to Fitzpatrick's home.

During the return trip, "Blair was just repeating himself, . . . then he turned to his cousin, he says did you see me, did you see me, I kicked him, I knocked him down, I hit him." Fleig stated that Fitzpatrick remained quiet. After some coaxing from Blair, Fitzpatrick gave the gun back to Fleig. Fleig claimed that he hid the gun in several places and ultimately threw it off a highway overpass. At some point during the ride, Blair threw his sneakers out of the car for fear that they had "blood or mud or something on them."

Once back at Fitzpatrick's home, Fitzpatrick instructed Blair and Fleig to wash their hands in white wine vinegar in order to remove any gunpowder residue. They also agreed, if questioned, to maintain that they had been together all night and had never left Fitzpatrick's house. At 2:40 a.m., Fleig dropped Blair off at his house in Dundalk and returned home.

Information surrounding the murder quickly surfaced, and the police brought Fleig in for questioning on the day of the shooting. The State elicited the following testimony from Fleig:

[PROSECUTOR:] Did [the police] ask you if you drove Mr. Blair that night?

[FLEIG:] They asked me a lot of questions about whether he had left the house and if he did, did I take him, did I know about it and things like that at that point.

[PROSECUTOR:] What did you tell the police?

[FLEIG:] No, no, no.

[PROSECUTOR:] Were you being truthful with the police?

[FLEIG:] No.

[PROSECUTOR:] Did they ask you if you had an idea of who might have committed this crime?

[FLEIG:] Yes.

[PROSECUTOR:] What did you tell them?

[FLEIG:] I didn't tell them anything. I told them no, I didn't know.

Fleig maintained that he was scared to tell the police the truth because Fitzpatrick had threatened his life.

Blair and Fleig were later arrested and scheduled to be tried together on murder charges. After the circuit court denied a defense motion to sever the trials, Fleig agreed to cooperate with the State in the prosecution of Blair, in exchange for a plea to accessory after the murder and the State's nol prosse of all other charges. On September 4, 1997, Fleig and his attorney, Timothy Gunning, executed a written plea agreement to this effect, which was supplemented with an "Addendum" on October 15, 1997. As part of the plea agreement, Fleig agreed to submit to a tape-recorded interview conducted by the prosecutor and detectives from the Homicide Unit of the Baltimore County Police Department concerning the events surrounding the murder (the "September interview"). He also agreed, *inter alia,* to wear a body wire to record conversations with Fitzpatrick, and agreed to direct police to his gun and Blair's discarded sneakers. Neither the sneakers nor the gun was recovered, however.

Sometime after Fleig negotiated the plea agreement with the State, Fleig visited Blair, on his own initiative, at the

Baltimore County Detention Center. Fleig testified that he suggested to Blair that he "cut a deal." Appellant responded that "blood was thicker than water," and that he was sticking to the agreed-upon alibi.

On cross-examination, appellant's counsel established that Fleig pleaded guilty on October 15, 1997, to a reduced charge and was testifying pursuant to a plea agreement with the State. Under the terms of the plea agreement, as amended, the State agreed to drop the murder and handgun charges against Fleig, and Fleig's sentencing was postponed until after the completion of Blair's trial. Further, pursuant to the terms of the Addendum, the court agreed to impose a sentence of five years of incarceration, with all but eighteen months suspended, provided Fleig complied with his obligations under the plea agreement.

At the request of appellant's counsel, Fleig read the following paragraph from the agreement:

If after the [September] interview the State is satisfied that the Defendant's testimony will assist them in the prosecution of Timothy Blair and/or any heretofore unnamed co-defendant(s) and that the contents of the taped statement are truthful, then the State will be bound by the Plea Agreement at all times thereafter unless the Defendant subsequently refuses to continue to cooperate or changes his statement or otherwise becomes untruthful.

That excerpt from the agreement prompted the following line of questioning:

[APPELLANT'S COUNSEL:] ... And you knew that the agreement said that the State had to be satisfied that your testimony would assist them before your murder charges are dropped, right?

[FLEIG:] I would guess so, yes.

[APPELLANT'S COUNSEL:] The only way to get your murder charges dropped was to assist them in the prosecution of Timothy Blair?

[FLEIG:] Definitely seemed that way.

[APPELLANT'S COUNSEL:] Right?

[FLEIG:] At the time I signed it, yes.

Fleig also testified about the addendum to the plea agreement, which stated:

If . . . the Defendant continues in full cooperation under the provisions of the [agreement], to the State's full satisfaction, as he has to date, the State will consider ~~recommending~~ that any incarceration imposed upon the Defendant to be served in the Home Detention Program of the Baltimore County Detention Center.[3]

He explained that he understood this language to mean that "as long as I'm not caught in a lie during my interviews with the prosecution, that they would not be so hard on me when I went to my own sentencing and I would be eligible for home detention."

Appellant's counsel also endeavored to question Fleig about several other matters, including whether Fleig (1) knew that he was violating the law by transporting a gun in his car; (2) told police about the fight at Fitzpatrick's home; (3) was honest when he told police on the day of the murder that he did not know who killed Fissell; (4) purposefully misled police about the location of his gun; (5) was being forthright with police about where he, Blair, and Fitzpatrick were at the time of the murder; (6) lied to the court at his bail review hearing as to whether he was at the Shore Property; and (7) would "say anything to get out of jail."

Additionally, defense counsel questioned Fleig about the September 1997 interview. The following colloquy is relevant:

[APPELLANT'S COUNSEL:] Okay. My question to you is do you remember what you told [the prosecutor] when he asked you [during the September interview] the question, did you ever—did you ever suggest [Blair and Fitzpatrick] not do this?

[FLEIG:] I don't recall off hand.

---

**3.** Fleig struck out and initialed the word "recommending."

[APPELLANT'S COUNSEL:] Let me play for you what you told [the prosecutor].

(Tape played).

[APPELLANT'S COUNSEL:] Is that you on that tape, Mr. Fleig?

[FLEIG:] Yes, it is.

[APPELLANT'S COUNSEL:] When he asked you directly did you ever suggest that they not do this, you didn't give him a straight answer, right?

[FLEIG:] Yes.

[APPELLANT'S COUNSEL:] Is that because you didn't or because you didn't want to give him a straight answer?

[FLEIG:] No, just didn't remember. It was—I just—it was too close to the situation still and I was still pretty much upset over everything. At the time that tape was made, I just didn't remember. . . .

* * *

[APPELLANT'S COUNSEL:] . . . [The prosecutor] asked you why you didn't tell the police everything that you knew when they asked you, right?

[FLEIG:] I would assume so. It's a logical question to ask someone in that position.

[APPELLANT'S COUNSEL:] You have testified here today that the reason you didn't tell the police everything you knew is your fear of James Fitzpatrick?

[FLEIG:] Uh-huh.

[APPELLANT'S COUNSEL:] That's not what you told [the prosecutor] when he asked you that question on September 4th, isn't that correct?

[FLEIG:] I don't know. Frankly, I was still suffering from shock at that point. I had been arrested, I had been accused, I had been splattered all over the newspapers, I had lost my motion as to severed trials, now I was cutting a deal, I was still in shock. I don't recall every single comment that was made. Luckily it was taped.

[APPELLANT'S COUNSEL:] Let me play you your response to that question. . . .

(Tape played)

[APPELLANT'S COUNSEL:] Conversation happens before you get into an automobile to go to Mr. Fissell's home.

[FLEIG:] Uh-huh.

[APPELLANT'S COUNSEL:] So when he asked you what you were afraid of, you didn't say it was Fitzpatrick, right?

[FLEIG:] Not specifically because I knew that it was understood.

[APPELLANT'S COUNSEL:] You knew it was understood?

[FLEIG:] Yes, I had already told them prior to that statement that he had threatened to kill me.

[APPELLANT'S COUNSEL:] Well, when he asked you specifically what you were—when he sought clarification, when he asked you what you were afraid of, you didn't tell him Mr. Fitzpatrick, you told him that you didn't know exactly how, what kind of trouble you were—I was in, how deep I was into it, how I was going to get out of it?

[FLEIG:] Uh-huh.

[APPELLANT'S COUNSEL:] So that was your fear, isn't that true.

[FLEIG:] Certainly.

[APPELLANT'S COUNSEL:] Your fear was how to get out of the trouble that you were in?

[FLEIG:] That was certainly part of it.

[APPELLANT'S COUNSEL:] The State gave you a way out?

[FLEIG:] Yes, they did.

Appellant's counsel then proceeded to question Fleig about the "Statement of Facts" that summarized the evening prior to and the morning of the shooting, as well as Fleig's involvement in the incident and subsequent investigation (the "Statement"). The Statement was prepared and submitted to the

circuit court in connection with the hearing on October 15, 1997, at which Fleig tendered his guilty plea. Fleig testified that he reviewed the Statement "briefly" and that he and his attorney, Timothy Gunning, signed it. Fleig also acknowledged that he "was present" while Gunning "went over" the Statement.[4]

When appellant's counsel confronted Fleig with the Statement, the following transpired:

[APPELLANT'S COUNSEL:] Now, page 2 of your [Statement] you wrote that Fitzpatrick suggested beating Edward Fissell to death with a shovel, correct?

[FLEIG:] Yes, he had made those comments.

[APPELLANT'S COUNSEL:] Yeah. Well, today you have testified that Mr. Blair was the one who suggested beating him with a shovel?

[FLEIG:] He did make those comments.

[APPELLANT'S COUNSEL:] Okay. In [the Statement] is there any statement as to whether or not Mr. Blair suggested beating Mr. Fissell with a shovel?

\* \* \*

[FLEIG:] They both said it.

\* \* \*

.[APPELLANT'S COUNSEL:] And in [the Statement] you say this suggestion occurred on the way down to the shore property?

[FLEIG:] Huh-uh.

[APPELLANT'S COUNSEL:] Prior sentence that you signed says, on the way Blair and Fitzpatrick began to talk about killing Uncle Eddie, Fitzpatrick suggested beating

---

**4.** As we shall see, Gunning later testified that the Statement, drafted by the State, did not include all of the facts Fleig had actually related to the prosecutor.

Edward Fissell to death with a shovel. What did you mean on the way?

[FLEIG:] They did talk about it on the way. Almost the same conversation at the house was reiterated in the car.

* * *

[APPELLANT'S COUNSEL:] In the [Statement] you never say—mention any discussion of a shovel back at the house, isn't that true?

[FLEIG:] According to [the Statement], the first mention is—well, the statement, there's one statement that says simply, Fleig agreed to drive them down to the shore property. Two statements later it brings up the fact that Fitzpatrick suggested beating Edward Fissell to death with a shovel.

This line of questioning led to a bench conference, at which the following ensued:

THE COURT: You know, fair is fair here. He did adopt that [S]tatement but he didn't prepare it.

* * *

[PROSECUTOR]: Judge, I can tell you since you brought it up, we intend now based on cross examination and your comment fair is fair to introduce [the tape of the September interview] and let the jury listen to it, because he is clearly testifying he's doing all this in response to the advice of counsel.... Now counsel is trying to suggest that this summary ... is somehow [a] flagrant lie when I think that fairly the jury should have the opportunity to listen to the taped statement....

* * *

[APPELLANT'S COUNSEL]: If there is a portion in the [recording of the September interview that is consistent with Fleig's present testimony], they can introduce it to

rehabilitate him as a prior consistent statement. I don't think the whole tape comes in but that portion.

* * *

THE COURT: ... [T]he summary was for purposes of the plea, wasn't it?

[PROSECUTOR]: Exactly.

THE COURT: And so the object of that summary was to satisfy his role as an accessory after the fact. That was the point [the prosecution was] trying to make.

[PROSECUTOR]: And legal—

THE COURT: They had to put in the fact of this murder and his role in it. That was the only point.

[APPELLANT'S COUNSEL]: Well, I think—

THE COURT: I may have made mistakes already letting you go as far as you have.

[PROSECUTOR]: We are going to get that out of Gunning when we call him because we are going to call him.

* * *

THE COURT: See the whole point here is you are trying to impeach him with something that is inconsistent.

[APPELLANT'S COUNSEL]: Right.

THE COURT: And because it's not in there doesn't make it inconsistent. This is what the problem is here.

[APPELLANT'S COUNSEL]: I think, I think it's also been established that omissions are, you know, when omitted is, you know, that is prime subject matter. I mean, this is—

THE COURT: It can be.

[APPELLANT'S COUNSEL]:—this is key to the—

THE COURT: It can be. But, you know, insofar as his plea was concerned, it wasn't necessary.

* * *

THE COURT: ... Now, when it comes to omissions, my ruling is this, if it is omitted from the [Statement], it doesn't necessarily constitute an impeachable event. If it is missing from the [September interview], it would.

When appellant's counsel resumed his cross-examination of Fleig, he confronted Fleig with the failure of the Statement to mention that Fleig: (1) pulled the gun out from under the driver's seat; (2) made the gun operable; or (3) suggested shooting Fissell. Appellant's counsel then attempted to impeach Fleig with excerpts from his earlier testimony at Fitzpatrick's trial.

On redirect, the State elicited further testimony from Fleig concerning the Statement:

[PROSECUTOR:] This is ... the [Statement].

[FLEIG:] Yes.

[PROSECUTOR:] Did you write that?

[FLEIG:] No.

[PROSECUTOR:] Is that a detailed synopsis of every thing [sic] that you have ever told police or the State in this case?

[FLEIG:] No.

[PROSECUTOR:] Do you know who wrote that?

[FLEIG:] No.

[PROSECUTOR:] You signed that document?

[FLEIG:] Yes.

[PROSECUTOR:] Was that document for purposes of your guilty plea?

[FLEIG:] I believe so.

[PROSECUTOR:] And on whose advice did you sign it?

[FLEIG:] My attorney's.

[PROSECUTOR:] Did you trust your attorney's advice?

[FLEIG:] Oh, yes.

We will include additional facts in our discussion.

### DISCUSSION

### I.

■ Appellant's first contention centers on the testimony of Gunning, Fleig's attorney. On the final day of the State's case, Fleig waived his attorney-client privilege in order to enable his attorney to testify for the State. Without objection, the prosecution called Gunning to the stand. At that point, the court instructed the jury:

> As you will shortly hear, Mr. Gunning is Mr. Fleig's lawyer. His testimony this morning is for the purpose of rehabilitating Mr. Fleig's testimony the other day. State will ask him certain questions about—well, I'll just let them ask the questions. You will hear them. It's really not being offered for the truth of it but to rehabilitate Mr. Fleig. If you think you need to rehabilitate him, I'm not suggesting that he does one way or the other. That's for you to decide, not me.

On direct examination, Gunning testified that Fleig retained him around February 1997 and that they discussed the incident on several occasions. Subsequently, the State communicated a tentative plea agreement. Gunning advised Fleig not to pursue an agreement until after the circuit court ruled on the severance motion. Following the denial of that motion on July 7, 1997, Gunning initiated plea negotiations with the State. According to Gunning, he and Fleig reached an agreement with the State on September 4, 1997, and Gunning was present when the State conducted the September interview.

In questioning Gunning, the State sought to show that Fleig's comments at the September interview were consistent with Fleig's comments to Gunning during counsel's interviews, and with Fleig's testimony at the earlier trial of Blair's codefendant, Fitzpatrick. Apparently, the State wanted to establish inferentially that Fleig's pre-trial statements to Gunning and at Fitzpatrick's trial were consistent with Fleig's testimony at Blair's trial. The following testimony is at the heart of appellant's first complaint:

[PROSECUTOR:] During [the September 4th] interview, Mr. Gunning, is what your client told the State concerning facts of that night consistent with the initial conversations that you had with him when he retained you, whenever that was in February of 1997?

[GUNNING:] Yes.

[DEFENSE COUNSEL]: Objection, Your Honor. He's asked—

THE COURT: No, overruled.

[DEFENSE COUNSEL]: He's asking him to draw a conclusion.

THE COURT: No. Overruled.

[DEFENSE COUNSEL]: Okay.

[GUNNING:] Yes, it's consistent.

The State also sought to bolster Fleig's credibility with the following:

[PROSECUTOR:] Mr. Gunning, were you present when your client testified at the James Fitzpatrick trial?

[GUNNING:] Yes, I was.

[PROSECUTOR:] In substance what he said concerning the facts of that night, were they consistent with what he told you when he first—were those facts about what happened on the night of the murder consistent with what he told you when he first retained you concerning the facts of the night of the murder?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[GUNNING:] Yes.

Appellant argues that the court erred in allowing the State to adduce such "consistency" testimony from Gunning. At oral argument, appellant indicated that he does not dispute the State's right to call Gunning as a witness once Fleig waived his attorney-client privilege. Rather, as articulated in appellant's brief and at argument, appellant's objection is to the conclusory content of Gunning's testimony. He complains that Gunning never articulated what Fleig actually said in his

discussions with Gunning, and he maintains that the State invaded the province of the jury with Gunning's general description of Fleig's pre-trial statements as consistent.

The State claims that it was proper to call Gunning to testify, because appellant previously sought to impeach Fleig with the Statement, which had been offered in connection with Fleig's guilty plea. Therefore, the State wanted to introduce the September interview through Gunning, in an "attempt to point out omissions from the [Statement] that may have been otherwise covered in the transcript of the [September interview]." The State posits that Gunning's testimony properly rehabilitated Fleig by detracting from the attack on Fleig's credibility.

Both parties rely on Md. Rule 5–616(c)(2) to validate their respective positions. That rule provides:

> (c) Rehabilitation. A witness whose credibility has been attacked may be rehabilitated by:
>
> * * *
>
> (2) Except as provided by statute,[5] evidence of the witness's prior statements that are consistent with the witness's present testimony, when their having been made detracts from the impeachment[.]

At the outset, we note that it is ordinarily within the sound discretion of the trial court to determine the admissibility of evidence. *See Conyers v. State,* 354 Md. 132, 176, 729 A.2d 910, *cert. denied,* —— U.S. ——, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *Hopkins v. State,* 352 Md. 146, 158, 721 A.2d 231 (1998); *Sowell v. State,* 122 Md.App. 222, 228, 712 A.2d 96 (1998), *aff'd,* 353 Md. 713, 728 A.2d 712 (1999); *see also* Md. Rule 5–104(a) (stating that "[p]reliminary questions concern-

---

5. *See* Md.Code (1974, 1998 Repl.Vol.), § 9–117 of the Courts & Judicial Proceedings Article ("C.J."). That section provides:

> It is not competent, in any case, for any party to the cause who has been examined therein as a witness, to corroborate his testimony when impeached by proof of his own declaration or statement made to third persons out of the presence and hearing of the adverse party.

ing ... the admissibility of evidence shall be determined by the court"); *Corbett v. State,* 130 Md.App. 408, 446–27, 746 A.2d 954 (2000). Thus, we will not disturb a trial court's evidentiary ruling absent error or a clear abuse of discretion. *Conyers,* 354 Md. at 176, 729 A.2d 910; *Hopkins,* 352 Md. at 158, 721 A.2d 231; *Robinson v. State,* 348 Md. 104, 121, 702 A.2d 741 (1997).

The Maryland Rules of Evidence, codified as Title 5 of the Maryland Rules, took effect July 1, 1994. Chapter 600 of that title governs witnesses and, with one exception, is modeled after Article VI of the Federal Rules. *See* Alan D. Hornstein, *The New Maryland Rules of Evidence: Survey, Analysis and Critique,* 54 Md. L.Rev. 1032, 1037 (1995). "The exception, Maryland Rule 5–616, is an omnibus impeachment rule for which there is no federal counterpart." *Id.; see* Lynn McLain, *Maryland Rules of Evidence, in* 7 *Maryland Practice* § 2.616.4(a), at 183–84 (1994 ed.). Section (c) of Rule 5–616 lists, but does not proscribe, methods of rehabilitation. *See* Md. Rule 5–616 Committee Note; McLain, *supra,* § 2.616.1(d), at 182. The seminal opinion explaining the meaning and application of subsection (c)(2) is *Holmes v. State,* 350 Md. 412, 712 A.2d 554 (1998).

In that case, Ellouise Thompson was asked to identify the individual who shot and killed her roommate. On the day of the shooting, Thompson gave the police a written statement in which she claimed that she did not see the assailant. Two days later, however, Thompson gave a second statement, in which she identified Darian Holmes as the killer. At Holmes's murder trial, Thompson testified consistent with her second statement. On direct examination, she explained that, because of fear for her safety, she had initially decided not to provide the police with the killer's identity. On cross-examination, the defense impeached Thompson with her first statement. Thereafter, on redirect, the State successfully moved Thompson's second statement into evidence, over the defendant's objection. On appeal, the defendant asked the "Court to determine whether a witness's prior consistent statement is admissible under Maryland Rule 5–802.1(b) to rebut a charge

of fabrication where the statement was made after a motive to fabricate arose." *Holmes,* 350 Md. at 415, 712 A.2d 554.

Maryland Rule 5–802.1(b) provides:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

\* \* \*

(b) A statement that is consistent with the declarant's testimony, if the statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive[.]

In addressing appellant's contention, the Court looked to Rule 5–802.1(b)'s federal analogue, Fed.R.Evid. 801(d)(1)(B),[6] and the Supreme Court's interpretation of that rule in *Tome v. United States,* 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). *Holmes,* 350 Md. at 418–22, 712 A.2d 554. The Court of Appeals explained that *Tome* interpreted the federal rule to require that "a prior consistent statement, introduced 'to rebut a charge of recent fabrication or improper influence or motive'... [must be] made before the alleged fabrication or improper influence or motive came into existence." *Id.* at 418, 712 A.2d 554 (citing *Tome,* 513 U.S. at 167, 115 S.Ct. 696). The Court of Appeals adopted that construction with respect to the Maryland counterpart to the federal rule. *Id.* at 422, 712 A.2d 554. Accordingly, the Court of Appeals held "that, in order to be admissible under Md. Rule 5–802.1(b), a prior consistent statement must have been made before the alleged

---

**6.** Fed.R.Evid. 801(d)(1)(B) provides:

(d) Statements which are not hearsay.—A statement is not hearsay if—

(1) Prior statement by witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive....

fabrication or improper influence or motive arose." *Id.* at 424, 712 A.2d 554.

Applying this reasoning to Holmes's appeal, the Court concluded that Thompson's prior consistent statement was not admissible under Rule 5–802.1(b), because it was offered to rebut her prior inconsistent statement, not to rebut a motive to fabricate. *Id.* at 424–25, 712 A.2d 554. Nevertheless, the prior consistent second statement was found to be admissible through application of Rule 5–616(c)(2). *Id.* at 427–428, 712 A.2d 554. The Court explained:

Under Md. Rule 5–616(c)(2), a prior consistent statement is admissible to rehabilitate a witness as long as the fact that the witness has made a consistent statement detracts from the impeachment. Prior consistent statements used for rehabilitation of a witness whose credibility is attacked are relevant not for their truth since they are repetitions of the witness's trial testimony. They are relevant because the circumstances under which they are made rebut an attack on the witness's credibility. Thus, such statements by definition are not offered as hearsay and logically do not have to meet the same requirements as hearsay statements falling within an exception to the hearsay rule, *e.g.*, Md. Rule 5–802.1(b). We therefore conclude that a relevant consistent statement admitted solely for the purpose of rehabilitation is not required to meet the stringent premotive requirement of Md. Rule 5–802.1(b).

Turning to the circumstances of this case, *the fact that Thompson made a consistent statement must be relevant to diminish the impeachment of Thompson in order for her consistent statement to be admissible under Md. Rule 5– 616(c)(2).* At trial, Thompson explained on direct examination that she initially was reluctant to give any statement to police because Petitioner knew that she had witnessed the murder and she was frightened for her safety. Although Thompson told one of her sons what Petitioner had done, Thompson's first statement to the police indicated that she did not see who committed the murder. Thompson also testified that Petitioner visited her the day after the murder

and that the next day she told the police that Petitioner murdered the victim. On cross-examination, defense counsel impeached Thompson with her prior inconsistent statement that she did not see who shot Harris, and during closing arguments, he further questioned the credibility of Thompson's statement implicating Petitioner.

\* \* \*

... Thompson's consistent statement detracted from the impeachment by rebutting her initial inconsistent statement to police that she did not see who shot Harris. It also put in perspective that her inconsistent statement was made because she was frightened of what Petitioner would do to her. Thompson's consistent statement therefore detracted from the impeachment by Thompson's inconsistent statement that was elicited by defense counsel and was admissible for rehabilitative purposes under Md. Rule 5–616(c)(2). *Id.* (emphasis added).

As *Holmes* makes clear, Md. Rule 5–616(c)(2) does not relieve a party seeking to admit a statement under that rule of the obligation to show the statement's relevance. As a general rule, in order for evidence to be admissible, it must be relevant. *See Conyers,* 354 Md. at 176, 729 A.2d 910; *Williams v. State,* 342 Md. 724, 736, 679 A.2d 1106 (1996); *State v. Joynes,* 314 Md. 113, 119, 549 A.2d 380 (1988); *Dorsey v. State,* 276 Md. 638, 643, 350 A.2d 665 (1976). Under Md. Rule 5–401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In the context of Rule 5–616(c)(2), a witness's rehabilitative prior consistent statement is relevant if it tends to detract from an attack on the witness's credibility. *See Holmes,* 350 Md. at 427–28, 712 A.2d 554.

We are not satisfied that Gunning's so called consistency testimony was relevant for purposes of Rule 5–616(c)(2). As noted, Fleig was impeached with specific portions of the Statement, as well as with his testimony from Fitzpatrick's

trial. In *Holmes*, the State chose to rehabilitate its witness by rebutting a pre-trial inconsistent statement with a subsequent pre-trial statement that was consistent with the witness's trial testimony. Here, the State attempted to rehabilitate Fleig by rebutting allegedly inconsistent pre-trial statements and omissions, made at Fitzpatrick's trial and in the Statement, with conclusory testimony from Fleig's lawyer that Fleig made other pre-trial statements during attorney-client interviews that were consistent with his pre-trial statements and trial testimony.

The State's effort was evidently aimed at establishing a consistency "chain": (1) Fleig told Gunning of the events surrounding the killing; (2) Fleig told the State during the September interview of the events surrounding the killing; and (3) Fleig testified at the Fitzpatrick trial as to events surrounding the killing. According to Gunning, all of these pre-trial statements were consistent with one another. The net result of the State's effort was to demonstrate through Gunning's testimony that Fleig's statements during the September interview and at Fitzpatrick's trial were consistent with Fleig's testimony at appellant's trial. Without the actual statements *themselves*, however, Gunning's conclusory remarks left the jury with nothing to consider. In essence, the jury was offered an opinion by one State's witness that another State's witness said the same thing on three different, prior occasions.

The vague, conclusory assertions and characterizations of the statements Fleig made to Gunning prior to Blair's trial failed to detract from the specific attacks appellant made on Fleig's credibility. Conclusions as to whether one, two, or ten pre-trial statements were consistent with one another may well differ according to who is asked. Therefore, we conclude that the trial court erred in admitting Gunning's so called consistency testimony.

## II.

As we intimated, during its direct examination of Gunning, the State moved to admit, over appellant's objection, the

transcript of the audio recording of the September interview. Initially, the court reserved ruling on the motion and the State continued its questioning. After Gunning answered several questions about Fleig's statements during the September interview, however, the court summoned the parties to the bench. The following colloquy ensued:

THE COURT: Tell me what parts shouldn't come in.

[APPELLANT'S COUNSEL]: Your Honor—

THE COURT: The Court has handed defense counsel [the transcript of the September interview] and suggested that he tell me what parts of [the transcript] should not come in.... I need specific objections to specific questions. I'm not going to do the work for you.

\* \* \*

THE COURT: I'm going to take a little recess, give you a chance to look at it.

[APPELLANT'S COUNSEL]: Okay.

After a short recess, the discussion resumed concerning the admissibility of the transcript and tape of the September interview:

[APPELLANT'S COUNSEL]: ... Your Honor, I am of the position that under Maryland Rule 5–616[ (c) ].

THE COURT: Which one?

[APPELLANT'S COUNSEL]: 5–616[ (c) ].

THE COURT: Yes, rehabilitation.

[APPELLANT'S COUNSEL]: Rehabilitation, which is what we are here for, and under the Holmes case and it's [sic] explanation of the purposes of rehabilitation—I mean, the point is is that rehabilitation is not a vehicle to subsequently go over a witness' [sic] testimony. If there are specific points that I impeached Mr. Fleig about concerning, you know, what he said about who was the one who brought up the conversation with the shovel, that's clearly an instance. You know, I cross examined him about the [State-

ment] where he said it's Fitzpatrick. If there is something that is prior consistent—

THE COURT: Here's the whole problem. You didn't cross examine him with respect to the [September interview]. That is the rub. That's the problem with this.

[APPELLANT'S COUNSEL]: I'm sorry sir?

THE COURT: You didn't cross[-]examine him with [the interview]. You cross examined him with a summary of [the September interview, i.e., the Statement].

\* \* \*

[APPELLANT'S COUNSEL]: ... I played two portions of the tape [of the September interview]. And certainly if there is something that explains or otherwise rehabilitates those portions of the tape, the State can do it. If there is something in [the transcript of the September interview] that is inconsistent with the issue regarding like who brought up the shovel, that they can ask him about. But there is so much in [the transcript] that is just a rehash of testimony. There is stuff in [the transcript] that was never testified to as to trial such as his conversations with Fitzpatrick subsequent to the night of this particular offense. There is just so much, so much stuff here.

I mean, again, Your Honor, if there is a specific—a specific line that they want Mr. Gunning to read and they want to argue to you that that somehow rehabilitates, I got no problem with that.

\* \* \*

[PROSECUTOR]: ... [W]hat [appellant's counsel is] trying to do is persuade you that the State should only be allowed to specifically introduce evidence of prior consistent statements where—on subjects that have been the subject of cross examination, but that's not the situation, Your Honor, I believe. Although counsel did identify specific areas of the [Statement] to support Mr. Fleig's guilty plea, he crossed the line—I won't say crossed the line—he measured

that against some limited statements that he played for the Defendant. So his attack, his whole attack is on credibility. These prior consistent statements, although not offered substantively, are for the purpose of rehabilitating that credibility.

. . .

... I think in essence [appellant's counsel] has opened the door because he has attacked the entire credibility of Mr. Fleig, and all we are attempting to do is show that what he has now testified to before this jury was the same thing he told Mr. Gunning prior to gaining a benefit, that being the plea agreement.

The court ruled that it would admit the transcript of the September interview subject to redactions, and noted that the jury had previously been informed that "the whole purpose of this is not as substantive evidence, but rather it's to rehabilitate Mr. Fleig." Defense counsel then voiced the following objection:

Your Honor, although I've argued the point of Maryland Rule 5–616[ (c) ], and I believe that the introduction of the entire tape and transcript is violative of that rule, I just want to make it clear that my objection is larger than that.

I believe that the introduction of this entire transcript also, number one, violates the hearsay rule; number two, violates my client's rights to confront and cross examine witnesses, and his rights under the 6th and 14th Amendments of the Constitution of the United States in Article 21, 22 of the Maryland Declaration of Rights. I just want to make clear, that my objection is much larger than the specific point that we are arguing.

Appellant also argued that redacting certain portions of the transcript was insufficient to render the transcript admissible.

On appeal, appellant avers that the State improperly used the transcript of the September interview to rehabilitate Fleig pursuant to Rule 5–802.1(b). Alternatively, appellant urges that, even if we conclude that the transcript was not inherently inadmissible, the court erred because its prejudicial nature

"greatly outweighed any marginal relevance it might have had on the issue of Fleig's credibility." *See* Md. Rule 5–403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). The State responds that the transcript was properly admitted pursuant to Rule 5–616(c)(2), and that appellant's allegations of prejudice are not preserved for our review.

We are satisfied that these issues are preserved. Moreover, we are of the view that neither Rule 5–802.1(b) nor Rule 5–616(c)(2) supports the trial court's decision to admit the entire transcript. The decision in *Holmes, supra,* 350 Md. 412, 712 A.2d 554, is instructive on both points. We explain.

In *Holmes,* as we noted earlier, the Court said: "[I]n order to be admissible under Md. Rule 5–802.1(b), a prior consistent statement must have been made before the alleged fabrication or improper influence or motive arose." *Holmes,* 350 Md. at 424, 712 A.2d 554. Here, Fleig's motive to fabricate arose at the moment Fissell was killed, if not earlier. *See McCray v. State,* 122 Md.App. 598, 609–10, 716 A.2d 302 (1998) (acknowledging that a criminal defendant's motive to fabricate exists from the time of the crime). Thus, the September interview was inadmissible under Rule 5–802.1(b).

Moreover, the September interview was not admissible under Rule 5–616(c)(2), because it does not detract from the impeachment. As we stated earlier, a witness's prior consistent statement is relevant, and therefore admissible under Rule 5–616(c)(2), if it tends to rebut an attack on the witness's credibility. *See Holmes,* 350 Md. at 427–28, 712 A.2d 554. Our review of the transcript of the September interview revealed several excerpts that could have been useful to rehabilitate Fleig. We do not agree with the State, however, that appellant's cross-examination of Fleig "opened the door" to the use or admission of the entire transcript of the Septem-

ber interview as the remedy to counteract appellant's use of the Statement.

▮▮▮ The attack lodged against Fleig's credibility was directed at specific alleged omissions in the Statement, and inconsistencies between that Statement and Fleig's trial testimony. In contrast, the transcript of the September interview contained material wholly collateral to matters relating to the impeachment or the rehabilitation of Fleig's credibility. The September interview was conducted after Fleig had agreed to plead guilty to a lesser charge, and clearly was cast in a light useful to the State. In large measure, the thirty-five page transcript of the September interview consisted of a repetition of Fleig's testimony as well as various hearsay statements. Consequently, when the jury adjourned to deliberate, it had a copy of what was tantamount to a written version of Fleig's trial testimony, wholly beneficial to the State. It was fundamentally unfair to appellant to permit the jury to deliberate with written remarks of only one witness, who happened arguably to be the State's single most critical witness.

### III.

Appellant challenges the court's refusal to permit him to inspect Gunning's notes of his interviews of Fleig, because Gunning's testimony focused on Fleig's statements during those interviews. In our consideration of this issue, we observe that the attorney's notes were not reviewed by the trial judge, nor did the trial judge permit defense counsel to include them as a sealed exhibit. Therefore, we do not have any information as to the contents of the notes.

On cross-examination of Gunning, defense counsel inquired whether Gunning had his notes with him from his initial interviews with Fleig. When Gunning indicated that he did, defense counsel asked if he could see them. The State objected, the court sustained the objection, and the following bench conference ensued:

[DEFENSE COUNSEL]: Your Honor, the State has sought to rehabilitate Mr. Gunning by saying that in September—

THE COURT: Mr. Gunning[?]

[DEFENSE COUNSEL]: Rehabilitate Mr. Fleig through Mr. Gunning by saying that, well, he gave consistent statements during this taped interview of September 4th, 1997. Mr. Fleig has waived his right to attorney/client privilege. I think that at this point I would like to know and review Mr. Fleig's statements to Mr. Gunning prior to that date to see whether or not that there are other inconsistencies in those statements. I mean, the bottom line is, is that Mr. Fleig's conversation about what happened in this case just didn't start on September 4th. I would like to know, and [the prosecutor] was asking Mr. Gunning several questions concerning, well, this was done because you know you—Mr. Fleig talked to you, Gunning, and gave you the full account of the case. I'd like to know what Mr. Gunning's notes reflect, what those conversations involved.

\* \* \*

[PROSECUTOR]: ... The point is if he wants to cross examine him about that, he has the right to do that but he doesn't have the right to all his notes. It's no discovery process here merely because a witness has waived a privilege. I'm sure he'd love to have them but he's not entitled to them.

THE COURT: I don't know. It would seem to me you could get this from Mr. Gunning. I mean, you can ask him whether what was told to him from February of '97 onward, has it always been consistent.

[PROSECUTOR]: I think that he has the right to ask him that question. But to merely go through his file to get information I think is prohibitive.

\* \* \*

THE COURT: ... My ruling will stand.

[DEFENSE COUNSEL]: Your Honor, just to preserve the record, may I ask that Mr. Gunning's notes of his conversation with Mr. Fleig be sealed and made a part of the record?

THE COURT: No.

On appeal, appellant reinvigorates his argument that he was entitled to review Gunning's notes of his interviews of Fleig for purposes of cross-examination. Appellant largely focuses on the attorney-client privilege and the work product doctrine. He contends that, once Fleig waived his attorney-client privilege, neither the privilege nor the doctrine precluded access to Gunning's notes. Moreover, he contends that the due process principles adopted by the Court of Appeals in *Carr v. State*, 284 Md. 455, 472–73, 397 A.2d 606 (1979), and its progeny govern disclosure of the notes.

Appellant also refers us to Maryland Rule 5–612, which states:

> If, while testifying, a witness uses a writing or other item to refresh memory, any party is entitled to inspect it, to examine the witness about it, and to introduce in evidence those portions which relate to the testimony of the witness for the limited purpose of impeaching the witness as to whether the item in fact refreshes the witness's recollection.

In this regard, appellant comments that "[i]t is interesting that although Gunning informed the court that he had reviewed his file prior to his testimony, he was able to protect his notes from disclosure simply by declining to refer to those notes to refresh his recollection on the stand." (Footnote omitted). He does not suggest that Rule 5–612 gave him access to Gunning's notes, however. Moreover, although Blair points out that the corresponding federal rule, Fed.R.Evid. 612, would likely have allowed him that access, he offers no other authority to support his argument as to Md. Rule 5–612.

In response to appellant's contentions, the State addresses each of appellant's points, with the exception of the work product doctrine. Interestingly, it has not referred us to any rule of law that clearly prohibited appellant's access to the notes.

■ By statute, "[a] person may not be compelled to testify in violation of the attorney-client privilege." C.J. § 9–108. As we explained in *Levitsky v. Prince George's County,* 50 Md.App. 484, 491, 439 A.2d 600 (1982), the attorney-client privilege "is a rule of evidence which prohibits the disclosure of the substance of a communication made *in confidence* by a client to his attorney for the purpose of obtaining *legal advice.*" (Emphasis added); *see State v. Pratt,* 284 Md. 516, 519–20, 398 A.2d 421 (1979). It is undisputed that here the privilege was waived; obviously, absent a waiver, the State could not have called Gunning as a witness.

■ Although the attorney-client privilege and the work product doctrine "appear to embrace the same concepts of confidentiality and zealous client advocacy, the work product doctrine is separate and distinct from the attorney-client privilege." *E.I. du Pont de Nemours & Co. v. Forma–Pack, Inc.,* 351 Md. 396, 406, 718 A.2d 1129 (1998); *see Pratt v. State,* 39 Md.App. 442, 446 n. 2, 387 A.2d 779 (1978) ("The work product doctrine . . . is separate from the attorney-client privilege and serves to protect materials from discovery that are not subject to another privilege."), *aff'd,* 284 Md. 516, 398 A.2d 421 (1979). Moreover, the attorney-client privilege is held by the client while the protections associated with the work product doctrine belong to the lawyer. *See Forma–Pack,* 351 Md. at 406, 718 A.2d 1129.

■ Fleig told Gunning about the events surrounding Fissell's murder in order to obtain legal advice. Similarly, at the time Fleig relayed that information, he intended his communication to be confidential, i.e., not disclosed to third persons. *See Forma–Pack,* 351 Md. at 416, 718 A.2d 1129 (citing *United States v. (Under Seal),* 748 F.2d 871 (4th Cir.1984)); *see also Ashcraft & Gerel v. Shaw,* 126 Md.App. 325, 351, 728 A.2d 798 (1999); *Trupp v. Wolff,* 24 Md.App. 588, 608–09, 335 A.2d 171, *cert. denied,* 275 Md. 757 (1975). As noted, however, Fleig waived his privilege. The following colloquy is relevant:

[PROSECUTOR:] Mr. Fleig, you were asked to come back here today for the purpose of making a legal ruling concerning what [sic] you may have a privilege with Mr. Gunning. Do you understand?

[FLEIG:] Yes.

[PROSECUTOR:] You understand that an individual who has retained an attorney has the privilege between that individual and their attorney?

[FLEIG:] Yes, I do.

[PROSECUTOR:] That there is—unless the individual agrees, in most circumstances the attorney ... cannot disclosè any information that that individual has provided to their attorney.

Do you understand that?

[FLEIG:] Yes, I do.

[PROSECUTOR:] We have explained to you that we have summonsed your attorney, Mr. Gunning, do you understand that?

[FLEIG:] Yes.

[PROSECUTOR:] And that it is our intention to put him on the witness stand to testify to statements you provided to him prior to entering the plea agreement that is the subject of this whole murder case, do you understand that so far?

[FLEIG:] Yes.

[PROSECUTOR:] So what we want to know is, first of all, have you had an opportunity to speak with Mr. Gunning today about that?

[FLEIG:] Yes, I did.

[PROSECUTOR:] Have you had an opportunity to speak to Mr. Gunning in the past about his—the possibility of him testifying in this case?

[FLEIG:] I had heard that it was likely but I didn't think that that was allowed and I blew it off.

[PROSECUTOR:] Now, the purpose of calling, as I said, Mr. Gunning to testify is about any information you provid-

ed to him regarding this matter prior, or excuse me, prior to
entry of the plea agreement, do you understand that?
[FLEIG:] Yes, I do.

[PROSECUTOR:] Our question to you is, do you consent to
having Mr. Gunning testify concerning communication from
you to him prior to entering into the plea agreement?
[FLEIG:] Yes.

Because Fleig waived his attorney-client privilege, no logical
ground exists to suggest that Gunning's notes were protected
by that privilege. Consequently, we turn to consider whether
the work product doctrine has any applicability in this case.

 The work product doctrine is broader than the
attorney-client privilege. It protects materials prepared in
anticipation of litigation from disclosure. *See generally Unit-
ed States v. Pollard (In re Martin Marietta Corp.)*, 856 F.2d
619, 624 (4th Cir.1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct.
1655, 104 L.Ed.2d 169 (1989); *Nutramax Lab., Inc. v. Twin
Lab. Inc.*, 183 F.R.D. 458, 463 n. 10 (D.Md.1998); *Shaw*, 126
Md.App. at 358, 728 A.2d 798; Christopher B. Mueller &
Laird C. Kirpatrick, *Evidence* § 5.31, at 460 (1995).[7] Two
categories of attorney work product, fact and opinion, are
included within the doctrine. *See Forma–Pack*, 351 Md. at
407–08, 718 A.2d 1129; *see also Hickman v. Taylor*, 329 U.S.
495, 507–08, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *Nutramax
Lab.*, 183 F.R.D. at 462. Fact work product generally consists
of "materials gathered by counsel (or at counsel's instructions)
in preparation of trial." Joseph F. Murphy, Jr., *Maryland
Evidence Handbook* § 904(A) (3d ed.1999). Opinion work
product concerns the attorney's mental processes. *See No-*

---

**7.** The Supreme Court recognized in *United States v. Nobles*, 422 U.S.
225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975):

Although the work-product doctrine most frequently is asserted as
a bar to discovery in civil litigation, its role in assuring the proper
functioning of the criminal justice system is even more vital. The
interests of society and the accused in obtaining a fair and accurate
resolution of the question of guilt or innocence demand that adequate
safeguards assure the thorough preparation and presentation of each
side of the case.

*bles,* 422 U.S. at 238, 95 S.Ct. 2160; *Forma–Pack,* 351 Md. at 407–08, 718 A.2d 1129. Neither fact nor opinion work product is ordinarily discoverable, but opinion work product, in particular, "is almost always completely protected form disclosure." *Forma–Pack,* 351 Md. at 408, 718 A.2d 1129; *cf. Morris v. State,* 59 Md.App. 659, 669, 477 A.2d 1206 (1984) (stating that the work product doctrine "is intended to protect and to act as a limitation upon pretrial discovery of a lawyer's strategies, legal theories and mental impressions"). *But see Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1200 (D.S.C.1974) ("[A]s the work product of the attorney becomes less a matter of creative legal thought and more a mere recognition of observed fact, the work product becomes increasingly susceptible to discovery.").

 Although witnesses' written statements are ordinarily fact work product, "an attorney's notes ... of witness interviews are usually viewed as opinion work product because they tend to reveal the attorney's mental processes." Mueller & Kirkpatrick, *supra,* § 5.32, at 469. The notes themselves reveal which of the client's remarks the lawyer " 'saw fit to write down' " and are likely " 'permeated with [the lawyer's] inferences.' " *Id.* (quoting *Hickman,* 329 U.S. at 513, 67 S.Ct. 385; *id.* at 517, 67 S.Ct. 385 (Jackson, J., concurring)).

The Supreme Court was careful to limit the doctrine's protections in the landmark decision of *Hickman,* 329 U.S. at 511, 67 S.Ct. 385:

> We do not mean to say that all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases. *Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had.* Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. *Or they might be useful for purposes of impeachment or corroboration.* And production might be

justified where the witnesses are no longer available or can be reached only with difficulty.

(Emphasis added); *cf. Morris,* 59 Md.App. at 669, 477 A.2d 1206 (concluding that the doctrine "was never intended to be an evidentiary privilege"). The Supreme Court further elucidated the doctrine's protections in *Nobles,* 422 U.S. at 225, 95 S.Ct. 2160. There, Robert Nobles was convicted on charges stemming from a bank robbery. The only evidence of consequence that linked Nobles to the crime was the identification testimony of two witnesses. "[A]n investigator for the defense interviewed both witnesses and preserved the essence of those conversations in a written report." *Nobles,* 422 U.S. at 227, 95 S.Ct. 2160.

At Nobles's subsequent trial, his counsel attempted to impeach the two eye-witnesses with information contained in the investigator's report. The prosecution sought disclosure of the relevant portions of the report. The district court ruled that it would only require disclosure of a court-edited report "if the investigator testified as to the witnesses' alleged statements from the witness stand." *Id.* at 228, 95 S.Ct. 2160. At the close of the Government's case, the defense called the investigator to the stand. When the defense indicated that it did not intend to produce the report, the court refused to allow the investigator to testify about his interviews with the witnesses.

The Supreme Court upheld the lower court's ruling. *See id.* at 240, 95 S.Ct. 2160. The following discussion is relevant:

[T]he defense proposed to call its investigator to impeach the identification testimony of the prosecution's eyewitnesses. It was evident from cross-examination that the investigator would testify that each witness' recollection of the appearance of the individual identified as respondent was considerably less clear at an earlier time than it was at trial. It also appeared that the investigator and one witness differed even as to what the witness told him during the interview. The investigator's contemporaneous report might provide critical insight into the issues of credibility

that the investigator's testimony would raise. It could assist the jury in determining the extent to which the investigator's testimony actually discredited the prosecution's witnesses.

* * *

It was therefore apparent to the trial judge that the investigator's report was highly relevant to the critical issue of credibility. In this context, production of the report might substantially enhance "the search for truth." We must determine whether compelling its production was precluded by some privilege available to the defense in the circumstances of this case.

*Nobles*, 422 U.S. at 231–32, 95 S.Ct. 2160 (quoting *Williams v. Florida*, 399 U.S. 78, 82, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970)).

Nobles argued that the work product doctrine protected the report from disclosure. In concluding that the doctrine's protection was unavailable, the Court reasoned:

[T]he work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system.... [T]he concerns reflected in the work-product doctrine do not disappear once the trial has begun.

* * *

The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived. Here [Nobles] sought to adduce the testimony of the investigator and contrast his recollection of the contested statements with that of the prosecution's witnesses. [Nobles], by electing to present the investigator as a witness, waived the privilege with respect to the matters covered in his testimony.

*Nobles*, 422 U.S. at 238–39, 95 S.Ct. 2160. The Court subsequently stated in a footnote:

What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances. Counsel necessarily makes use throughout trial of the notes, documents, and other internal materials prepared to present adequately his client's case, and often relies on them in examining witnesses. When so used, there normally is no waiver. *But where, as here, counsel attempts to make a testimonial use of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents.*

*Id.* at 239 n. 14, 95 S.Ct. 2160 (emphasis added); *accord Martin Marietta,* 856 F.2d at 624; *cf. Musselman v. Phillips,* 176 F.R.D. 194, 199–200 (D.Md.1997) (holding that protected work product is discoverable when a lawyer communicates it to an expert witness who considers it for purpose of providing expert trial testimony).

■ Thus, the protection generally afforded by the work product doctrine may be waived. The United States Court of Appeals for the Fourth Circuit has stated that actions that are consistent with a "conscious disregard of the advantage that is otherwise protected by the work product rule," may waive the doctrine's immunity. *Doe v. United States (In re John Doe ),* 662 F.2d 1073, 1081 (4th Cir.1981) (stating also that "to effect a forfeiture of the work product protection by waiver, disclosure must occur in circumstances in which the attorney cannot reasonably expect to limit the future use of the otherwise protected material"), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982); *see Nutramax Lab.,* 183 F.R.D. at 463–64. The Fourth Circuit has interpreted *Nobles* to control situations involving "non-opinion work-product" and "held that subject matter waiver applies to non-opinion work-product when testimonial use of non-opinion work-product is made." *Martin Marietta,* 856 F.2d at 625 (discussing *Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1222–23 (4th Cir.1976)). The Court defined "subject matter waiver" as "any disclosure of a confidential communication outside a privileged relationship," concluding that such disclosure

waives "the privilege as to all information related to the same subject matter." *Id.* at 623.

In this case, appellant did not ask the court to allow him to fish through Gunning's files. Rather, his request was narrowly tailored; he sought production of those notes that were potentially important to effective cross-examination, and perhaps impeachment, of Gunning. The State cannot have it both ways. It cannot call Gunning to testify as to the consistency between Fleig's statements made during attorney-client interviews and Fleig's other statements, and then turn around and suggest that appellant was not entitled to see the witness's notes that contained the substance of the statements made during the interviews. Accordingly, we are of the view that any protection the work product doctrine may have afforded to Gunning's notes was waived when Gunning gave his so called consistency testimony about Fleig's statements during attorney-client interviews. Thus, under the circumstances attendant here, we conclude that the trial court erred in not allowing appellant to review the portions of Gunning's notes that pertained to statements Fleig made to Gunning about the occurrence.

As noted, appellant also contends that the due process principles contained in *Carr v. State,* 284 Md. at 472–73, 397 A.2d 606, bolster his claim that he was entitled to review Gunning's notes. In *Carr,* the Court of Appeals adopted tenets espoused in the Supreme Court's decision of *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). "Those principles relate to the importance of cross examination and the significance, to an accused, of determining whether a witness' trial testimony is inconsistent with the witness' prior written statement on the subject." *Robinson v. State,* 354 Md. 287, 301, 730 A.2d 181 (1999); *see Butler v. State,* 107 Md.App. 345, 356, 667 A.2d 999 (1995) (stating that in *Carr,* the Court " 'first held that at trial, upon request, defense counsel must be permitted the opportunity to inspect prior statements of the State's witnesses for purposes of cross-examination' ") (citation omitted); *Leonard v. State,* 46

Md.App. 631, 637, 421 A.2d 85 (1980) (concluding that under *Carr*, "a defendant's right, at trial, to inspect the prior statement of a State's witness who has testified is not necessarily limited (1) by the rules pertaining to pretrial discovery, or (2) to statements that are merely exculpatory"), *aff'd*, 290 Md. 295, 429 A.2d 538 (1981).

■ The State correctly points out that access to the prior statements of a State's witness under *Jencks–Carr* principles is contingent on the fact that the prosecutorial arm of the government possesses the statement. *See Robinson*, 354 Md. at 304, 730 A.2d 181. It contends that "the notes kept in the file of Fleig's attorney, Gunning, were never in the possession of the State, constructively or otherwise." In view of our resolution of the work product issue, we need not resolve whether the State "possessed" Gunning's notes for purposes of *Jencks–Carr* principles.

## IV. Harmless Error

■ The State argues expressly in its discussion of appellant's access to Gunning's notes, and implicitly in its analysis of the other issues, that any error in this case was harmless beyond a reasonable doubt. Appellant contends that the court erred on each of his three points and that each error individually requires reversal. As to whether the trial court's errors were harmless, we turn to the oft-cited standard provided in *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976):

[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Id.* at 659, 350 A.2d 665; *see Jensen v. State,* 355 Md. 692, 708–09, 736 A.2d 307 (1999); *Corbett,* 130 Md.App. at 428–29, 746 A.2d 954.

The cumulative error in this case is not harmless beyond a reasonable doubt. Gunning's consistency testimony impermissibly bolstered Fleig's testimony. Admission of the transcript allowed for the reproduction to the jury of many "prior consistent statements" supporting Fleig's testimony. Finally, we are unable to determine the level of harm associated with the failure to allow appellant to review Gunning's interview notes, because the trial court denied appellant's request to place them in the record. Thus, we are constrained to vacate the judgment in this case and remand the matter to the trial court for further proceedings.

**JUDGMENTS OF CONVICTION VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY BALTIMORE COUNTY.**